98 Cal.Rptr.2d 63 (2000)
82 Cal.App.4th 200
J. Scott McFETTERS, Plaintiff and Appellant,
v.
AMPLICON, INC., et al., Defendants and Respondents.
No. G021374.
Court of Appeal, Fourth District, Division Three.
July 17, 2000.
Review Denied November 15, 2000.[*]
*67 Brady, Kwong & Crisp, and M. Christine Brady, Irvine, for Plaintiff and Appellant.
Latham & Watkins, Jon D. Anderson, Costa Mesa, Gregory P. Lindstrom, San Francisco, Scott B. Cooper, Julie V. King and Linda Schilling, Costa Mesa; Neil G. Kenduck, Santa Ana, for Defendants and Respondents.

OPINION
SILLS, P.J.
J. Scott McFetters sued his former employer, Amplicon, Inc. (Amplicon), and its principal, Patrick Paddon, on various causes of action arising out of Paddon's physical battery of McFetters and subsequent events culminating in the termination of McFetters' employment. The trial court granted a nonsuit on McFetters' causes of action for constructive termination, false imprisonment and intentional infliction of emotional distress, but allowed McFetters' cause of action for assault and battery to go to the jury. The jury returned a verdict in favor of McFetters, awarding him $80,000 in compensatory damages, $140,000 in punitive damages against Amplicon and $650,000 in punitive damages against Paddon. The trial court granted a judgment notwithstanding the verdict (JNOV), reducing McFetters' award to $1,000 in compensatory damages, plus $2,000 in punitive damages each against Amplicon and Paddon, for a total of $5,000. The court also granted a conditional new trial on the ground of excessive damages, in the event the judgment notwithstanding the verdict failed to survive appeal.
McFetters argues the court erred in granting the nonsuit, and in granting the JNOV and the conditional new trial. He also challenges the court's refusal to allow one of his experts to testify during the punitive damages phase of trial, and its refusal to award him costs.

* * *
Because this appeal seeks review of orders granting nonsuits and a JNOV, we consider the evidence in the light most favorable to McFetters, the plaintiff below. We must construe the evidence most favorably to McFetters' case and resolve all presumptions, inferences, and doubts in his favor. Unigard Ins. Group v. O'Flaherty & Belgum (1995) 38 Cal.App.4th 1229, 1234-1235, 45 Cal.Rptr.2d 565 [nonsuit]; Stubblefield Construction Co. v. City of San Bernardino (1995) 32 Cal.App.4th 687, 703, 38 Cal.Rptr.2d 413 [JNOV].)
Amplicon is a company with a net worth of $100 million, which is in the business of leasing large computer equipment to businesses. Paddon is Amplicon's majority shareholder, CEO and President. McFetters began working as a sales representative for Amplicon in 1989, directly out of college. Over the course of several years, he developed a significant customer base and became one of Amplicon's most successful salespeople.
During the early part of McFetters' employment, Amplicon's basic equipment lease provided the customer with various options at the end of the initial lease term. The customer could choose to lease newer equipment at a higher price, renew the lease for the original equipment, or purchase the original equipment outright for its fair market value. However, the customer also had the option of simply returning the original equipment at the end of the lease and walking away.
After McFetters had been employed for awhile, Amplicon introduced a new lease, referred to as the "ABC" lease. The ABC lease gave the customer only three options at the end of the lease term: (a) purchase the leased equipment at a "mutually agreeable price"; (b) renew the lease at the same rate; or (c) lease new equipment at the same or greater expense. If the customer and Amplicon did not reach an agreement on options (a) or (c), then option *68 (b) providing for renewal of the lease was automatically effective.
Amplicon did not require its salespeople to sell only the ABC lease; although it encouraged use of the ABC lease, it allowed the salespeople some leeway to negotiate different terms and to continue using other lease forms.
McFetters initially sold the ABC lease, but he later developed ethical concerns about it. He felt the ABC lease was misleading to customers, as it virtually locked them into a continuing relationship with Amplicon, while giving them the impression the "mutually agreed price" provision offered them a meaningful choice. With a "mutually agreed price" provision, Amplicon could simply set a purchase price as high as it wanted. It actually had no incentive to agree to a reasonable price, as the customer was essentially forced into a new lease term if no agreement was reached.
Amplicon trained its salespeople to downplay the significance of the ABC lease provision limiting the customer's purchase option to a "mutually agreeable" price. If a customer questioned it, the salespeople were told to say mutually agreeable price was very similar to fair market value, and to assure the customer that Amplicon would have every incentive to be reasonable, so as to preserve its long-term relationship with the customer.[1] In private, however, Paddon told McFetters that Amplicon could make more money from a single ABC lease than it would in 10 years of other deals with a customer. McFetters was also told to represent that software included in an ABC lease would probably have little or no value at the end of the lease, so the customers would assume they would be able to keep the software for little or no cost, while in reality, Amplicon intended to charge significantly more under the "mutually agreeable" provision.
In light of his misgivings, McFetters ultimately declined to sell ABC leases, choosing instead to continue selling leases which allowed the customer the option of returning the equipment at the end of the term, and which contained a more evenhanded provision for purchase of the equipment in the event the customer chose to pursue that option.
Additionally, Paddon asked McFetters to make additional changes beneficial to Amplicon in previously negotiated leases, prior to the customer's execution, but without notifying the customer of the change. Specifically, in certain leases wherein the customer had negotiated a provision to purchase the equipment for 10 percent of its initial cost at the end of the lease term, McFetters was told to insert the phrase "not less than" before the "ten percent," which would allow Amplicon to later negotiate for a higher price. McFetters was also asked to change or remove a contract addendum previously used and relied upon by a particular customer, prior to execution of a new contract. In both cases, McFetters refused.
Paddon also asked McFetters to participate in what were referred to as "rate bumps." According to McFetters, a "rate bump" was a trick used to mislead the customer into thinking his lease payments would be less than they ultimately turned out to be. In Amplicon's leases, the payments were tied to a base interest rate, generally represented to be the T-bill rate. But rather than use the real T-bill rate, *69 Amplicon encouraged its salespeople to represent the current rate as lower in a commitment letter to the customer, so as to make it appear the payments would be lower. After the customer signed on and the equipment was installed, the actual Tbill rate was used in calculating the lease payments, resulting in the "rate bump."[2] Again, McFetters refused to participate in what he considered to be an unethical practice.
Amplicon also delayed commission payments to its salespeople, sometimes for no reason other than Paddon's refusal to promptly sign or distribute the checks. McFetters complained openly, and apparently widely, about those delays.
Paddon made it clear that he wanted McFetters to "get on board" with Amplicon's sales practices, and that he considered McFetters to have a poor attitude. He instructed McFetters not to discuss his complaints about the company with any other employee, as Paddon felt that McFetters' negativity would have an adverse impact on employee morale.
In July of 1994, Amplicon announced its sales plan for fiscal year 1995. Some of the salespeople, including McFetters, were unhappy with it, as it instituted a higher bonus for selling ABC leases. McFetters felt the new structure would make it difficult to maintain his income selling "walk away" leases.
On July 13, 1994, McFetters was in his office, which he shared with another salesperson, Janice Burney. Burney had not been present at the meeting where the new sales plan was announced, so she began asking McFetters questions about it. He was initially reticent to talk, and gave her clipped answers to her questions. Burney persevered, and McFetters "reluctantly" came over to her desk and began discussing the sales plan.
While they were discussing the plan, Paddon walked by the office. Overhearing McFetters, Paddon became enraged and marched into the office demanding to know if McFetters was complaining. McFetters responded "yes ... a little bit," at which point Paddon lunged at him, grabbing him forcibly and hitting him, shaking him and dragging him out of the office. The contact left welts on McFetters' arm.
Burney described the altercation as "violent," "humiliating," "frustrating" and "embarrassing." She stated she actually looked down because she was "very frightened." She heard "body impacting" and "scuffling," but with her eyes downcast she saw only McFetters' feet which she described as "off balance." She heard McFetters "yanked out of the office." Based upon that incident, Burney decided to terminate her employment with Amplicon, which she did a short time later.
Once Paddon pulled McFetters from his office, he proceeded to drag him down the hall toward the reception area. While dragging, Paddon pulled McFetters close to his face and told him "you're fucking fired." He also told McFetters "you think you have value? You have none.... You're nothing." He called McFetters a detriment to the company and said he always had been.
When they reached the reception area, Paddon told McFetters to sit in a chair and not move until his supervisor, David Sedgwick, came in, warning McFetters he would not like what was going to happen to him. Paddon then returned to his own office down the hall. Although McFetters was closer to the elevator than he was to Paddon's office, he was afraid to move from the chair, because of "what [Paddon] might do." McFetters knew Paddon had on occasion brought a gun to the office, *70 and that he had threatened to shoot another employee if he came back on the premises.
After 15 minutes to a half an hour, Sedgwick arrived at the office and took McFetters into a conference room. McFetters explained what had happened, including that he had been physically assaulted and fired. Sedgwick then took McFetters into Paddon's office to discuss the incident. Paddon yelled at Sedgwick about how McFetters was a negative influence on the company. Paddon also demanded that McFetters write a letter of resignation which Paddon could hold and use "at any time he wanted." Sedgwick dissuaded Paddon from the resignation letter.
McFetters then returned to his own office where he wrote down some notes to make a record of what had happened. Within the next day or two, he edited those notes to provide a more comprehensive and descriptive account of the events. He testified the edited notes were better than his initial draft, since he had been under extreme emotional stress at the time of the initial draft.
After McFetters made the initial notes, Sedgwick came into his office and attempted to calm him down, suggesting that Paddon must have had a bad day and advising McFetters to let the matter "blow over." He also assured McFetters that he would no longer have to deal with Paddon directly, and that Sedgwick would act as a go-between.
In the wake of the assault and battery, McFetters left the office for the rest of the day. He felt humiliated and in shock. He was depressed, jittery, dizzy, had difficulty breathing and experienced some chest pain. He later experienced headaches, stomach aches, nightmares and a return of a previous teeth grinding problem, all of which he attributed to the distress and humiliation of that incident. McFetters testified the incident also affected his self-esteem and confidence, and as of the time of trial, he was still afraid of what Paddon might do to him.
When he returned to work, McFetters was also assured by other supervisory personnel, Tom Cannon and Drew Schlegel, that they would make sure he no longer had to deal with Paddon personally. In light of those assurances, McFetters was committed to staying at Amplicon for several reasons. He had feelings of loyalty to a company he had worked for since college, but he was also worried that if he terminated his employment, he would lose substantial commissions on contracts he had completed but for which he had not yet been paid. According to McFetters, Amplicon had a policy of not paying commissions owed to salespeople when they left the company. Also, leaving Amplicon meant he would have to walk away from the customer base he had developed and start over from scratch at another company.
However, Paddon continued to find ways to torment McFetters. He made disparaging remarks about him to other management personnel, calling him a "coupon clipper" who worked 30 hours a week and sat around collecting benefits from the company. He said he thought McFetters had a poor attitude, that he made too much money and that he wanted him fired.
Paddon also engaged in rather juvenile intimidation tactics such as interrupting conversations McFetters was having by walking in between him and the person he was speaking to, keeping his back to McFetters, and simply beginning a new conversation with the other person as if McFetters was not there. He would also, on occasion, walk up to McFetters, grab his tie, flip it over to check the label, and then drop it and walk away. After McFetters injured his shoulder in a car accident, Paddon made a point of seeking him out, taking hold of his arm and moving it about while asking "does that hurt?" (It did.)
Paddon also played games with McFetters' commissions. In some cases payment was delayed; in another case a deal was *71 split into two different years, resulting in McFetters being paid a lower commission; and in yet another case, one of McFetters' deals was rejected simply to "teach the little shit a lesson."
Additionally, in the months following the assault, the supervisors who had acted as buffers between McFetters and Paddon began leaving the company; Sedgwick left voluntarily and Cannon was fired. Under all of those circumstances, despite his desire to remain at Amplicon, McFetters began exploring his options with other companies. He wanted to make sure he "would be protected in case something happened." In October or November of 1994, McFetters received an oral offer of employment from another company, if he was willing to start within a certain period of time. However, he was still committed to working for Amplicon, so the offer lapsed. In January of 1995, McFetters received another offer of employment from a competing company.
Also in January of 1995, Schlegel, the last of McFetters' three management intermediaries, announced he was leaving the company. McFetters, however, remained committed to staying as he had "a lot of happy clients" and he could not take any of those clients with him if he left Amplicon, because Amplicon had sued former salespeople in the past for trying to do business with its customers. He was also owed approximately $50,000 in commissions.
On January 23, 1995, the first business day after Schlegel left the company, McFetters reported to work with no intention of quitting. He and other salespeople were called into a meeting with Keith Duggan, a regional sales manager, who told them he would be running their sales group. After the meeting, Duggan asked to speak privately with McFetters, and then began to tell McFetters about a "rumor" that McFetters was planning to leave with Schlegel. When McFetters denied any such intent, Duggan told him Paddon wanted to meet with him personally and stated it would be "a good idea if you did." McFetters refused. Duggan later came back to McFetters' office, telling him he had spoken to Paddon and set up a meeting for that afternoon. McFetters again refused to meet with Paddon, reminding Duggan that Paddon had physically assaulted him. Duggan noted that since Cannon, Sedgwick and Schlegel were no longer with the company, McFetters had only him.
McFetters tried to explain his position to Duggan one more time that day in Duggan's office. Again, Duggan was unsympathetic. During the conversation, Paddon walked in declaring the "place ... has been getting a lot better since we got rid of the ... dead weight." At that point, McFetters concluded his working situation was intolerable and he terminated his employment that day.
In June of 1995, McFetters filed this lawsuit, alleging causes of action for (1) wrongful termination in violation of public policy; (2) breach of implied contract of employment; (3) breach of the implied covenant of good faith and fair dealing; (4) breach of contract (regarding failure to pay commissions); (5) assault; (6) battery; (7) false imprisonment; and (8) intentional infliction of emotional distress. In September of 1996, defendants offered to settle the entire case for $10,000 pursuant to Code of Civil Procedure section 998. The offer was rejected.
The trial was bifurcated, and the parties proceeded first on the issue of whether McFetters was an at-will employee. The court determined as a matter of law that he was not, and held his employment could be terminated only for cause. The parties subsequently settled the breach of contract cause of action relating to commissions for $22,500.
After McFetters presented his case to the jury, defendants moved for nonsuit as to all causes of action other than assault, battery and intentional infliction of emotional distress. The court granted the motion *72 in its entirety, and subsequently granted nonsuit on all aspects of the intentional infliction of emotional distress claim other than distress arising directly out of the assault and battery.
The jurors were informed that only the assault, battery and related emotional distress was before them. They returned a unanimous verdict awarding McFetters $80,000 compensatory damages and a 9-3 finding that both Amplicon and Paddon acted with malice and oppression.
In the punitive damages phase of the trial, the court would not allow McFetters' expert accountant to testify because McFetters' expert witness disclosure statement did not specify he would testify regarding punitive damages. The jury awarded $650,000 in punitive damages against Paddon and $140,000 in punitive damages against Amplicon.
The court entered a judgment on special verdict awarding McFetters $870,000 in damages, plus interest and costs. Defendants then moved for a judgment notwithstanding the verdict (JNOV) and a new trial.
On February 28, 1997, the court granted the JNOV, unilaterally reducing McFetters' damages to $1,000 compensatory and $2,000 in punitive damages each against Amplicon and Paddon. Although its tentative ruling was to deny the new trial, the court stated the denial was based upon its belief that JNOV was the more appropriate remedy of the two. When defendants' counsel pointed out that "they" (presumably referring to the drafters of the Code of Civil Procedure) preferred the court to rule on the merits of the new trial motion, in the event the JNOV was reversed on appeal, the court "toss[ed] in a grant" on the new trial motion.
In explaining its reasoning, the court remarked, "I think [the jury] totally lost it on this case. [¶] To me no reasonable person would conclude the damages or anything remotely like this were appropriate. [¶] ... [¶] ... I'm going to award damages in the amount of a thousand dollars. I'm going to award damages in the sum of $2,000 punitive against Paddon, and $2,000 punitive against Amplicon, and I do this because this is a situation where there is no physical injury, no medical bills, no lost income, and no credible testimony about emotional distress. [¶] No reasonable person could believe that McFetters suffered anything more than a bruised ego, anger and embarrassment which is what happens when the boss grabs you and pinches you and drags you through the office for a tongue-lashing. [¶] [¶] To call this a $900,000 case is simply wrong.... It is a gross, egregious injustice in terms of damages." The court ordered defendants to prepare the "appropriate judgments."
On March 4, 1997, defendants sent the court a request that it prepare an appropriate written order stating the grounds and specifying the reasons supporting its grant of a new trial. Defendants pointed out that Code of Civil Procedure section 657 precluded the attorney for any party from preparing the order, but went on to remind the court of the grounds upon which the new trial had been sought and the reasons the court gave for rejecting the verdict.
On that same date, the court entered its formal order granting a new trial. The order stated the new trial was granted on the ground of excessive damages. It noted that the "most telling [evidence was] the un-edited memo written by the plaintiff shortly after the incident.... It is crystal clear, as defendant has always admitted, that a battery occurred, the question has always been one of appropriate and just damages as a result thereof." The reasons given in support of the order were "[t]his tort caused no injury, nor pain nor suffering, nor lost income. It damaged no property and inflicted no emotional distress beyond the plaintiffs justified anger and humiliation."
The court entered the $5,000 JNOV on March 14, 1997. Despite McFetters' objection *73 that he remained the prevailing party, the court declined to award him costs.

I
McFetters first attacks the nonsuits ordered by the court on his causes of action for wrongful termination, false imprisonment and emotional distress. "A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, plaintiffs evidence does not permit a jury to find in plaintiffs favor. In determining whether plaintiffs evidence is sufficient, the court may not weigh the evidence or consider witnesses' credibility. Instead, the court must accept as true the evidence most favorable to plaintiff and must disregard conflicting evidence. The court must give to the plaintiffs evidence all the value to which it is legally entitled, indulging every legitimate inference that may be drawn from the evidence in plaintiffs favor...." We cannot sustain the nonsuit "unless, interpreting the evidence most favorably to plaintiffs case and most strongly against the defendant and resolving all presumptions, inferences, and doubts in favor of the plaintiff, a judgment for defendant is required as a matter of law." (Unigard Ins. Group v. O'Flaherty & Belgum, supra, 38 Cal.App.4th at pp. 1234-1235, 45 Cal.Rptr.2d 565, citations omitted.)
McFetters' first three causes of action allege he was constructively terminated. The first alleges wrongful termination in violation of public policy, while the second and third allege he was terminated without good cause in violation of his employment agreement. All three causes of action depend upon the assertion that McFetters was constructively terminated, i.e., forced out of the company due to intolerable conditions. (Turner v. Anheuser-Busch, Inc. (1994) 7 Cal.4th 1238, 32 Cal.Rptr.2d 223, 876 P.2d 1022.) In granting the nonsuit, the trial court concluded that all three causes of action failed because the conditions of McFetters' employment were not, as a matter of law, intolerable.
In Turner, the court described the severity of the conditions necessary to constitute constructive discharge. "The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee. [¶] ... [¶] In order to amount to a constructive discharge, adverse working conditions must be unusually `aggravated' or amount to a `continuous pattern' before the situation will be deemed intolerable." (Turner v. Anheuser-Busch, Inc., supra, 7 Cal.4th at pp. 1246-1247, 32 Cal. Rptr.2d 223, 876 P.2d 1022, fn. omitted.) The ultimate issue is "`whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit' [Citations.]" (Id. at p. 1248, 32 Cal.Rptr.2d 223, 876 P.2d 1022.)
The trial court reasoned that Paddon's physical assault of McFetters, standing alone, "might have" been sufficient, "had [McFetters] resigned when it happened. However, at the time of [McFetters'] departure, it was ancient history, much attenuated by the passage of time which period provided isolation from Paddon...." The court concluded that the remainder of McFetters' working conditions, including Paddon's continued taunting and denigrating of him, the withholding of commissions, and the refusal to approve a deal just to "teach [him] a lesson," among other things, "were trivial." We disagree.
Contrary to the trial court's analysis, we conclude the various "trivial" incidents cannot be evaluated without reference to the earlier physical assault. An assault *74 and battery on an employee by the owner of the company during the course of a business day is simply not the type of incident that is forgotten within a few months. That incident gave McFetters (and the jury) ample reason to conclude Paddon was not an entirely stable and rational person. That knowledge naturally colors perceptions of Paddon's later conduct. In light of the parties' history, the jury could conclude that events which might have otherwise appeared trivial, were menacing and significant here.[3]
Additionally, although the court acknowledged that McFetters' insistence on isolation from Paddon in the wake of the assault was beneficial to him, it failed to consider that when Schlegel, the last of the three supervisors who enforced that isolation, left Amplicon, McFetters was required to once again deal directly with Paddon. That factor alone was enough to transform what might have been a (perhaps barely) tolerable situation into an intolerable one.
The evidence in this case was more than sufficient for a jury to conclude that while McFetters showed a strong "motivation ... to remain on the job to earn a livelihood and to serve his ... employer" (Turner v. Anheuser-Busch, Inc., supra, 7 Cal.4th at p. 1246, 32 Cal.Rptr.2d 223, 876 P.2d 1022), Paddon's continued hostility, combined with the departure of McFetters' supervisor-intermediaries, created a situation which no reasonable employee would have tolerated.[4] Consequently, the nonsuits on McFetters' second cause of action for breach of implied contract of employment and third cause of action for breach of the implied covenant of good faith and fair dealing, based solely on the conclusion that no jury could find McFetters' working conditions to be objectively intolerable at the time he left, are reversed.
The nonsuit on McFetters' first cause of action, for employment termination in violation of public policy, was based on the additional conclusion that the alleged basis for the termination, i.e., McFetters' refusal to engage in the fraudulent and misleading sales tactics favored by Amplicon and his complaints about Amplicon's failure to pay timely commissions, did not violate public policy. Again we disagree.
"In order to sustain a claim of wrongful discharge in violation of fundamental public policy, [the plaintiff] must prove that his dismissal violated a policy that is (1) fundamental, (2) beneficial for the public, and (3) embodied in a statute or constitutional provision."[5] (Turner v. Anheuser-Busch, Inc., supra, 7 Cal.4th at p. 1256, 32 Cal.Rptr.2d 223, 876 P.2d 1022, fns. omitted.)
The court characterized the business practices of Amplicon, including misrepresenting the effect of the ABC lease, the "rate bump" ploy and the altering of terms on previously negotiated leases, as merely "hard-nosed bargaining techniques." The court noted that "[m]any contracts are entered into with one party hoping the adversary does not fully examine or appreciate *75 the clear provisions of the contract which might favor that party." The court also pointed out that because Amplicon's "sharp business practice[s]"[6] were employed prior to execution of the final contracts, they resulted in the formation of integrated agreements, subject to the parol evidence rule, which could not later be challenged on the basis of those negotiating tactics.
In our view, persuading customers to execute an ABC lease by telling them that "mutually agreed price" is the same as "fair market value," when the company has no intention of ever agreeing to a fair market value, is not a "hard nosed bargaining technique," it is a lie. Likewise, representing to customers that it is probable their software can be obtained for little or no cost at the end of the lease, when Amplicon's policy is to set a high price, is also a lie. Moreover, altering previously negotiated terms in an agreement, without mentioning the change, is deceitful. Sure, the other party might re-read the previously negotiated terms one more time before signing, and notice the change, but if that were the expectation, Amplicon would affirmatively disclose the change. In reality, such tactics are practiced in the hope the other party will not notice the change, and sign an agreement it did not intend. The conduct attributed to Amplicon is not acceptable. It is sleazy and wrongful, and we are frankly shocked that the trial court could conclude otherwise. Moreover, in our view, the fact that a customer induced by such tactics to sign an agreement might later be foreclosed by the parol evidence rule from challenging it makes the deception more egregious, not less as the trial court seemed to assume.
Business and Professions Code section 17200 (hereinafter section 17200) is part of a statutory scheme designed to prohibit business practices which tend to deceive or take advantage of customers. Section 17200 provides in pertinent part that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." The section 17200 proscription of `unfair competition' is not restricted to deceptive or fraudulent conduct but extends to any unlawful business practice. The Legislature apparently intended to permit courts to enjoin ongoing wrongful business conduct in whatever context such activity might occur. (Barquis v. Merchants Collection Assn. (1972) 7 Cal.3d 94, 111, 101 Cal. Rptr. 745, 496 P.2d 817.)
Respondents argue that section 17200 is "too vague" to provide the basis of a public policy violation, because a "`constitutional or statutory provision must sufficiently describe the type of prohibited conduct to enable an employer to know the fundamental public policies that are expressed in that law.'" (Turner v. Anheuser-Busch, Inc., supra, 7 Cal.4th at p. 1256, fn. 9, 32 Cal.Rptr.2d 223, 876 P.2d 1022, quoting Sequoia Ins. Co. v. Superior Court (1993) 13 Cal.App.4th 1472, 1480, 16 Cal.Rptr.2d 888.) In our view, section 17200 is sufficient for that purpose. Indeed, in Sequoia Insurance, the quoted language was used in the context of making clear that a statute need not specifically proscribe the specific act of which the employer is accused. (Sequoia Ins. Co. v. Superior Court, supra, 13 Cal.App.4th at p. 1480, 16 Cal.Rptr.2d 888.) In any case, it is unlikely that an employer could fail to understand that the type of tactics encouraged by Amplicon to induce unsuspecting customers into signing its leases would fall within the definition of "unfair business practices" contained in section 17200.
*76 In addition to section 17200, McFetters also points to Civil Code section 1709[7] and Penal Code section 484[8] as further evidence that the business practices of Amplicon were wrongful. Because we have concluded that the business practices described by McFetters included intentional misrepresentations and deceptions, we agree. Terminating McFetters' employment for refusing to engage in such conduct would violate public policy.
Having concluded that the evidence of wrongful business practices was sufficient to go to the jury on McFetters' cause of action for wrongful termination in violation of public policy, we need not address whether his additional allegations relating to delays in payment of commissions provided an additional basis for that cause of action. The nonsuit on the first cause of action is also reversed.
The court also granted a nonsuit on McFetters' seventh cause of action, false imprisonment, because it concluded there was no evidence that McFetters was required to remain seated in the reception area through threat of force or violence. Again, we conclude there was sufficient evidence to send that issue to the jury.
"All that is necessary to make out a charge of false imprisonment is that the individual be restrained of his liberty without any sufficient complaint or authority therefor, and it may be accomplished by words or acts which such individual fears to disregard. Temporary detention is sufficient, and the use of actual physical force is not necessary." (Ware v. Dunn (1947) 80 Cal.App.2d 936, 943, 183 P.2d 128.) "Words or conduct furnishing a reasonable apprehension on the part of the one restrained that he will not be allowed to depart is sufficient." (Schanafelt v. Seaboard Finance Co. (1951) 108 Cal. App.2d 420, 423, 239 P.2d 42.)
In this case, McFetters was placed in the chair and ordered to remain there only moments after being physically assaulted and berated by Paddon, the owner of the company for which he worked. In that context, it would not be unreasonable for McFetters to fear additional violence. And although Paddon left the immediate area after telling McFetters to remain in the chair, he was not far away. Even assuming McFetters could easily reach the elevator before Paddon could reach him, elevators sometimes take awhile to arrive, and there would likely have been time for Paddon to get to McFetters before the elevator did. Finally, there is the issue of the gun which had at times resided in Paddon's office. McFetters could not be sure Paddon did not have a gun, nor could he be sure that Paddon, in his enraged state, would not use a gun in reaction to further misbehavior by McFetters. It would hardly be the first time someone was shot in an office. Under these circumstances, a jury could easily conclude that McFetters, in the wake of his humiliating encounter with Paddon, remained seated in the reception area only because he was reasonably afraid he would not be allowed to depart. The nonsuit on that cause of action is also reversed.
Finally, the court granted a nonsuit on the eighth cause of action for intentional infliction of emotional distress. Consistent with its grant of nonsuit on the constructive termination claim, the court concluded that the various small torments practiced on McFetters in the wake of the assault were insignificant and trivial, and could not amount to the "extreme and outrageous conduct" required for intentional infliction of emotional distress. (See *77 Potter v. Firestone Tire & Rubber Co. (1993) 6 Cal.4th 965, 1001, 25 Cal.Rptr.2d 550, 863 P.2d 795.) And consistent with our evaluation of the nonsuit on the constructive termination claim, we disagree. As we have already explained, McFetters' treatment in the wake of the assault cannot be viewed independently of that incident. McFetters cannot be expected to react lightheartedly to torments (small or otherwise) inflicted upon him by a man who so thoroughly humiliated him in the recent past. And the fact that Paddon occupied a position of authority over McFetters made the treatment all the worse.
In Agarwal v. Johnson (1979) 25 Cal.3d 932, 160 Cal.Rptr. 141, 603 P.2d 58, plaintiff alleged intentional infliction of emotional distress in an employment context based upon his supervisor's use of racial epithets against him and recommendation that his employment be terminated for reasons that were untrue. The court noted that "[b]ehavior may be considered outrageous if a defendant (1) abuses a relation or position which gives him power to damage the plaintiffs interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress." (Id. at p. 946, 160 Cal. Rptr. 141, 603 P.2d 58.) Similarly, in Alcorn v. Anbro Engineering, Inc. (1970) 2 Cal.3d 493, 86 Cal.Rptr. 88, 468 P.2d 216, the Supreme Court held that an employee had sufficiently alleged intentional infliction of emotional distress because his supervisor shouted racial epithets and fired him. The court found it significant that the person harassing the plaintiff was "standing in a position or relation of authority over plaintiff." (Id. at p. 498, 86 Cal.Rptr. 88, 468 P.2d 216, fn. omitted.)
Respondents attempt to distinguish this authority on the basis that a racial slur is somehow inherently more egregious than anything else an employer can say. We cannot agree. Racial slurs, while certainly egregious and distressing, are by definition not personal. They demean a group of people and ultimately reflect more on the person making them than the person receiving them. In this case, Paddon made disparaging remarks about McFetters that were specific to him personally. And he did not stop with those remarks. He also tormented McFetters physically when he had the opportunity to do so. We conclude that such conduct, when viewed in the context of the relationship between Paddon and McFetters, would be sufficient to sustain a jury's determination of extreme and outrageous conduct. The nonsuit on the eighth cause of action is also reversed.[9]

II
McFetters also challenges the court's order granting a JNOV. We agree the order cannot be sustained. In Teitel v. First Los Angeles Bank (1991) 231 Cal. App.3d 1593, 282 Cal.Rptr. 916, the court held that a JNOV cannot be used to rectify what is perceived to be an award of excessive damages.
"The Legislature has provided an exclusive remedy for a trial court to employ where some damages are properly awarded, but the amount is excessive. That is through a remittitur pursuant to Code of Civil Procedure section 662.5. Were we to accept [defendant's] position that the trial judge is empowered to select an appropriate level of punitive damages and compel *78 its determination by a judgment notwithstanding the verdict, we would find little or no purpose for the remittitur statute. We do not believe the Legislature intended such a result. Rather, the legislative system as enacted makes it plain that damages, except those which may be determined as a matter of law, are to be fixed by the trier of fact and, if erroneous in amount, subject to the reduction or new trial procedure specified in Code of Civil Procedure section 662.5, subdivision (b)." (Teitel v. First Los Angeles Bank, supra, 231 Cal.App.3d at pp. 1604-1605, 282 Cal. Rptr. 916, fn. omitted.)
We find the reasoning of Teitel to be persuasive. If the court concludes the evidence could not warrant the amount of damages awarded by the jury, the proper remedy is a remittitur, in which plaintiff has the opportunity to consent to a lower amount, with the understanding the court will order a new trial if plaintiff refuses. With a new trial, plaintiff will be able to submit the issue to a different jury.
In this case, as in Teitel, the court sought to impose its own damage figure in place of the jury verdict, without regard to plaintiffs consent, and without affording plaintiff an option to retry the issue before a new jury. That attempt, which had the effect of usurping the jury's function, was improper. The JNOV must be reversed.

III
The court backed up its JNOV with an order granting a new trial. A new trial on the ground of excessive damages is appropriate when the court, "after weighing the evidence ... is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." (Code Civ. Proc, § 657.) "The amount of damages is a fact question, committed first to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. (Pool v. City of Oakland (1986) 42 Cal.3d 1051, 1067 [232 Cal.Rptr. 528, 728 P.2d 1163]; Seffert v. Los Angeles Transit Lines (1961) 56 Cal.2d 498, 506 [15 Cal. Rptr. 161, 364 P.2d 337].)" (Westphal v. Wal-Mart Stores, Inc. (1998) 68 Cal. App.4th 1071, 1078, 81 Cal.Rptr.2d 46.) "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears. This is particularly true when the discretion is exercised in favor of awarding a new trial, for this action does not finally dispose of the matter. So long as a reasonable or even fairly debatable justification under the law is shown for the order granting the new trial, the order will not be set aside. [Citations.]" (Jiminez v. Sears, Roebuck & Co. (1971) 4 Cal.3d 379, 387, 93 Cal.Rptr. 769, 482 P.2d 681.)
In this case, the court noted that in its view, the damages awarded were "grossly ... excessive" because the assault and battery caused no injury to McFetters, no pain and suffering nor significant emotional distress and caused no lost income. And while there was certainly sufficient evidence upon which the jury could have concluded otherwise on some of those issues, the court is entitled, on a motion for new trial, to reweigh the evidence and reach its own conclusion. We simply cannot say that it abused that broad discretion here.
Further, there is no indication, as McFetters suggests, that the court was somehow misled into granting the motion for new trial after respondents' counsel "misrepresented" the preferred procedures when both a JNOV and a new trial have been requested. To the contrary, Code of Civil Procedure section 629 does provide that the court may grant both a JNOV and a new trial on the merits, and specifies in that situation that the new trial order is effective only if the JNOV does not survive appeal. In Hozz v. Felder (1959) 167 Cal.App.2d 197, 200, 334 P.2d 159, the court described the procedure *79 much as respondents did in this case: "section 629 provides that a motion for a judgment n.o.v. may be made with the alternative reservation of the right to move for a new trial and that the court shall pass upon both." (Italics added.) We can discern nothing improper in counsel's argument.
Also, McFetters offered no evidence the court was misled into doing something it did not want to do. Clearly, the court wanted to vacate the judgment entered on the jury verdict, which is why it granted the JNOV. However, as discussed above, a new trial, rather than a JNOV, was the appropriate procedure for accomplishing that goal. Consequently, counsel's comments merely assisted the court in accomplishing its desired result.
Finally, McFetters contends that because the determination of damages is an issue committed to the exclusive province of the jury, it is not enough that the court merely disagree with the amount awarded. To justify an entire new trial, the court must also explain how the jury was misled, by passion or prejudice, into granting an excessive amount of damages. The requirement that the court specify reasons for its conclusion serves a dual purpose. First, it "promote[s] judicial deliberation before judicial action, and thereby `discouraged] hasty or ill-considered orders for new trial.'" (Mercer v. Perez (1968) 68 Cal.2d 104, 113, 65 Cal.Rptr. 315, 436 P.2d 315.) Second, it "make[s] the right to appeal from the order more meaningful" (ibid.) by providing the appellate court with sufficient information to evaluate the new trial order.[10]
McFetters relies upon Bigboy v. County of San Diego (1984) 154 Cal.App.3d 397, 201 Cal.Rptr. 226 for the proposition that an order granting a new trial on the ground of excessive damages must articulate "reasons for concluding that the jury was misled or prejudiced such that the jury should have reached a different decision."
In Bigboy, the plaintiff was awarded a verdict of $2.25 million for severe and permanent injuries he suffered in an automobile accident. The court, despite having previously declared that the evidence would have supported a larger verdict, denied a new trial motion on the condition plaintiff accept a remittitur reducing the damages to $1.75 million. In its order, the court stated only that the verdict was excessive when compared to other verdicts in similar cases, and that it attributed the size of the award to defendant's "indefensible" position and plaintiffs "unusual appeal." (Bigboy v. County of San Diego, supra, 154 Cal.App.3d at pp. 402-403, 201 Cal.Rptr. 226.)
In rejecting the new trial order, the Court of Appeal in Bigboy noted, "It is helpful if the court declares what witnesses it believed, what testimony was to be disregarded or the value of any impeachment. [Citation.] The court should set forth how it arrives at a lower figure. [Citation.] The court should briefly identify criticized evidence. [Citation.] A general statement one figure is too high and another figure too low is insufficient. [Citation.]" (Bigboy v. County of San Diego, supra, 154 Cal.App.3d at p. 404, 201 Cal.Rptr. 226.)
Respondents assert the jury was influenced by passion and prejudice because it heard the evidence relating to McFetters' claims of wrongful termination, false imprisonment and intentional infliction of emotional distress, prior to the court's grant of nonsuit on those issues. That evidence, a litany of misconduct which cast Paddon and Amplicon in a bad light, was not relevant to the narrow issue of the assault and battery committed on McFetters, and once the jury heard it, it was impossible to "unring the bell." In *80 essence, respondents contend that the damages awarded in this case were excessive because they reflect the jury's attempt to compensate McFetters not only for the assault and battery, but for the entire chain of circumstances which led to the termination of his employment.
Of course, we will never know exactly what was in the jury's mind. But we cannot agree that the jury's award must be considered excessive merely because it may have represented an attempt to compensate McFetters for the entirety of the claims asserted. As explained above, we have determined the trial court was in error in granting nonsuits on McFetters' other claims, and have concluded those claims should have been given to the jury.
Additionally, we are not unmindful of the enormous expense, both financial and emotional, which will be incurred in retrial of this case. The original trial consumed 25 court days, and we have no reason to assume a second trial will be shorter. And the expense of such a retrial weighs far more heavily on McFetters than on respondents, who have the deepest of pockets.
Under these circumstances, we conclude that McFetters should have the option of essentially adopting respondents' view of the case, and accepting the jury's verdict of $870,000 in full compensation for his claims. In doing so, he can avoid the expense and uncertainty of a retrial, and respondents will be assured that the award will not be greater than what they believe this jury intended. On the other hand, if McFetters elects not to accept the verdict as his entire damages, he is entitled to a retrial of the entire case. McFetters must elect within 10 days from issuance of the remittitur herein whether to accept the jury's verdict or retry the case.

IV
We need not reach the remainder of McFetters' contentions. The issue of costs under the judgment ultimately entered by the court is moot. If McFetters elects to accept a judgment of $870,000, then he is indisputably the prevailing party, and this case would be remanded for a determination of his costs as such. On the other hand, if he elects a retrial, his claim of entitlement to costs will be based upon the outcome of the new trial. Similarly, the expert issue will be moot under either of McFetters' options. If he accepts the verdict as his judgment, it will be irrelevant whether the court erred in precluding his expert accountant from testifying during the punitive damages phase of the trial. And in the event of a new trial, discovery proceedings will be reopened (see Fairmont Insurance Co. v. Superior Court (2000) 22 Cal.4th 245, 92 Cal.Rptr.2d 70, 991 P.2d 156), and McFetters will have the opportunity to correct any perceived deficiency in his expert designation.

V
Should McFetters elect a retrial of this matter, we conclude it must be assigned to a different judge than the one who presided over the first trial. (Code Civ. Proc, § 170.1, subd. (c); see In re Marriage of Iverson (1992) 11 Cal.App.4th 1495, 15 Cal.Rptr.2d 70.) Various comments made by the judge during the course of the trial would cause a reasonable person to question whether he appreciated the seriousness of the conduct at issue. For example, in connection with granting the nonsuits, the judge labeled many of the charges against defendants as "trivial." He summed up his view of the case by telling McFetters' counsel that while she might characterize the chain of events which culminated in the termination of McFetters' employment as "bright crimson" he saw them as "extremely pale pink, if not white."
During testimony in front of the jury about Paddon keeping a gun in the office, the judge made a joke about whether Paddon used salesmen for target practice in the hallways. Perhaps most revealing, the judge even suggested that, rather than *81 McFetters resorting to the courts for redress, "maybe Paddon should have been punched out."
We would have thought it went without saying that courts do not advocate escalating violence as a remedy for intentional torts. And while we recognize that the judge's comments may not actually reflect his own beliefs in that regard, we nonetheless conclude the cumulative effect of his comments might convey the impression he found this case too insignificant to occupy the court's time. "[C]onduct on the part of the trial judge, indicating his unsympathetic attitude toward the litigation, does not accord with recognized principles of judicial decorum consistent with the presentation of a case in an atmosphere of fairness and impartiality, and it cannot be condoned." (Webber v. Webber (1948) 33 Cal.2d 153, 163, 199 P.2d 934.) In the event McFetters elects to retry this case, he should not have to do so under such a cloud. Consequently, a different judge shall preside if a retrial is sought.

VI
Defendants filed a notice of cross-appeal in this case, and later dismissed it in reliance on Lippert v. Avco Community Developers, Inc. (1976) 60 Cal.App.3d 775, 131 Cal.Rptr. 730. Lippert holds that when an appeal is taken from a court's grant of a JNOV, no precautionary cross-appeal is necessary, because (1) the court's original judgment is vacated by the JNOV and no direct appeal lies from a vacated judgment, and (2) California Rules of Court, rule 3(c) (hereinafter rule 3(c)) does not provide for cross-appeals from the judgment after entry of a JNOV. We asked the parties to brief the issues of whether Lippert was correctly decided, and whether, if we conclude Lippert is incorrect, respondents can yet pursue their cross-appeal.
Lippert is procedurally similar to this case. The court granted post-judgment motions for a JNOV and a new trial, and plaintiffs appealed those orders. Defendant failed to file any appeal or crossappeal from the judgment as originally entered. The Court of Appeal then reversed the post-judgment orders and reinstated the original judgment. After issuance of the remittitur in that first appeal, defendants filed a notice of appeal from the original judgment, and plaintiffs moved to dismiss that appeal.
We have no quibble with the Lippert court's first point, that no direct appeal can be taken from a judgment vacated by a posttrial order. When the posttrial order itself is not appealed, it becomes final, the prior judgment is forever vacated, and an appeal from it would serve no purpose.
However, the Supreme Court has long since held that "when an appeal is taken from such an order the vacating effect is suspended, and the judgment remains effective for the purpose of an appeal from the judgment." (Spencer v. Nelson (1947) 30 Cal.2d 162, 164, 180 P.2d 886, citing Jackson v. Dolan (1927) 202 Cal. 468, 261 P. 706.) Indeed, as the court explained over a century ago, in Mountain Tunnel Gravel Mining Co. v. Bryan (1896) 111 Cal. 36, 38, 43 P. 410, when a posttrial order vacating a judgment has been appealed, "during this time the judgment had such a life that an appeal could be taken from it; and that in effect it was not dead but sleeping." (Italics added.) The Supreme Court also long ago rejected the notion that a prevailing party on a posttrial motion could sit back, see how the appeal of the order played out, and then if the order was reversed, file an appeal from the original judgment. In Puckhaber v. Henry (1905) 147 Cal. 424, 425, 81 P. 1105, the court stated, "[i]t would subject the adverse party to an unjust and unwarranted delay if, as here, after prevailing upon his appeal from the order granting him a new trial, he was still to be confronted with the postponed appeal from the judgment which had been left slumbering...." The rule stated in these venerable *82 cases has not been changed. (Beavers v. Allstate Ins. Co. (1990) 225 Cal.App.3d 310, 330, 274 Cal.Rptr. 766, quoting Spencer v. Nelson, supra, 30 Cal.2d 162, 180 P.2d 886.)
We recognize that the cases cited, which hold that a cross-appeal must be pursued, involve posttrial motions for new trial, rather than JNOVs. However, in our view, that is a distinction without a difference. In each case, the intent of the posttrial motion is to vacate the earlier judgment; if the order becomes final, that earlier judgment is a nullity. And if the order is reversed on appeal in either case, the earlier judgment is automatically revived. The Supreme Court's analysis of the appealability issue and its rationale for requiring an immediate cross-appeal apply equally in either case.[11]
Without acknowledging the extensive Supreme Court authority holding that a judgment is valid for purposes of appeal until a posttrial order vacating it becomes final, Lippert relies exclusively on rule 3(c) in concluding that a cross-appeal challenging such a judgment is unauthorized. In our view, Lippert's analysis is too restrictive.
Rule 3(c) provides in pertinent part, "When a timely notice of appeal is filed under subdivision (a) of rule 2 or under subdivision (a) or (b) of rule 3, any other party may file a notice of appeal within 20 days after mailing of notification by the superior court clerk of such first appeal or within the time otherwise prescribed by the applicable subdivision, whichever period last expires. If a timely notice of appeal is filed from an order granting a motion for a new trial or granting, within 150 days after entry of judgment, a motion to vacate the judgment or to vacate judgment and enter another and different judgment, any party other than the appellant, within 20 days after mailing of notification by the superior court clerk of such appeal, may file a notice of appeal from the judgment...."[12] In Lippert, the court simply concluded that because rule 3(c) made explicit reference to a cross-appeal from the judgment after the grant of a new trial and after the grant of a motion to vacate a judgment, but no reference to a cross-appeal after the grant of a JNOV, no such cross-appeal could be brought. We disagree.
In its opening sentence, rule 3(c) states without restriction that when a timely notice of appeal is filed by any party, "any other party may file a notice of appeal." While it does go on to specify three situations in which cross-appeals may be pursued, that list is by no means exhaustive, and we certainly cannot read it as exclusive. Moreover, even if we did view the list as exclusive, we would not agree that the situation in which a JNOV is granted would be excluded. The rule specifies that *83 cross-appeals from the judgment may be filed after (1) the grant of a new trial, (2) the grant of a motion to vacate judgment, and (3) the grant of a motion to vacate judgment and enter another different judgment. In our view, the grant of a JNOV is, in fact and effect, an order vacating a judgment and entering another and different judgment.[13]
In light of the foregoing, we conclude the Lippert court was incorrect when it concluded that rule 3(c) precluded a crossappeal from the judgment after entry of a JNOV. It follows that the court further erred in holding that a separate appeal, filed after the appellate court reversed the JNOV, was the only appellate remedy available to challenge the original judgment, and must therefore be allowed.
We now turn to the issue of what, if any, effect our disagreement with Lippert should have in the instant case. Respondents contend they relied in good faith on Lippert, which is the only reported case on this specific issue, and no other court has yet questioned it in a published opinion. They also note that the issue is one of procedure rather than substance. Based upon those factors, they urge us to give prospective effect only to our determination that Lippert is incorrect. We find their arguments persuasive.
In Woods v. Young (1991) 53 Cal.3d 315, 330, 279 Cal.Rptr. 613, 807 P.2d 455, the Supreme Court stated "Unlike statutory enactments, judicial decisions, particularly those in tort cases, are generally applied retroactively. But considerations of fairness and public policy may require that a decision be given only prospective application. Particular considerations relevant to the retroactivity determination include the reasonableness of the parties' reliance on the former rule, the nature of the change as substantive or procedural, retroactivity's effect on the administration of justice, and the purposes to be served by the new rule." (Citations omitted.)
In this case, we cannot say we are entirely pleased with respondents' reliance on Lippert, as its reasoning is, in our view, inconsistent with long standing Supreme Court authority analyzing how the grant of posttrial motions vacating a judgment will affect the appealability of that judgment. On the other hand, Lippert was directly on point, and uncontradicted. Consequently, it was not unreasonable for respondents to rely upon it.
Additionally, we agree that the issue of when a party may properly pursue an appeal of a judgment following successful posttrial motions is procedural rather than substantive. (See, e.g., Camper v. Workers' Comp. Appeals Bd. (1992) 3 Cal.4th 679, 12 Cal.Rptr.2d 101, 836 P.2d 888 [holding that issue of timeliness for filing a writ of review is a procedural issue]; Woods v. Young, supra, 53 Cal.3d at p. 330, 279 Cal.Rptr. 613, 807 P.2d 455 [holding that the issue of when a statute of limitations is tolled is procedural].) And we recognize that "[retroactive application of an unforeseeable procedural change is disfavored when such application would deprive a litigant of `any remedy whatsoever.'" (Woods v. Young, supra, 53 Cal.3d at p. 330, 279 Cal.Rptr. 613, 807 P.2d 455, quoting Chevron Oil Co. v. Huson (1971) 404 U.S. 97, 108, 92 S.Ct. 349, 30 L.Ed.2d 296.)
Finally, we cannot discern that making our ruling prospective only will have any substantial affect on the administration of justice or will undermine the purpose of *84 the rule. As we have previously noted, there seem to be relatively few cases in which a JNOV is granted (or at least relatively few that result in published opinions) and in the vast majority of those cases, the party who is successful in obtaining the JNOV does file a protective cross-appeal. (See fn. 11, ante.) Consequently, we have no reason to conclude that giving our decision prospective effect only will expose the courts to a flood of pending bifurcated appeals.
In light of the factors set forth in Woods, we conclude that our decision disagreeing with Lippert should not be applied retroactively to this case, and respondents should be allowed to pursue an appeal from the judgment in the manner set forth in Lippert. However, to reduce further delay in the resolution of this case, we direct that any such appeal must be handled in an expedited fashion. If McFetters elects to take the $870,000 jury award as his complete and final award, respondents shall have the right to file a notice of appeal from that judgment. If such an appeal is filed, the parties shall rely upon the voluminous trial court record we already have, with any appropriate augmentations on motion, and respondents shall file their opening brief within 30 days of the filing of their notice of appeal. The deadlines for a respondent's brief and any reply brief will be determined in accordance with the California Rules of Court.
The nonsuits ordered on McFetters' causes of action for wrongful termination in violation of public policy, breach of implied contract of employment, breach of the implied covenant of good faith and fair dealing, false imprisonment, and intentional infliction of emotional distress are reversed. The JNOV is reversed.
The superior court is directed to allow McFetters, within 10 days from issuance of the remittitur, to elect either to accept $870,000 as his entire judgment in this case or retry the entire matter before a different judge. In the event McFetters elects to take the judgment, respondents shall have 30 days from the issuance of the remittitur to file a notice of appeal from that judgment, and 30 days thereafter to file their opening brief in this court. McFetters is to recover his costs on appeal.
CROSBY, J., and O'LEARY, J., concur.
NOTES
[*] In denying review, the Supreme Court ordered that the opinion be not officially published. See California Rules of CourtRules 976 and 977).
[1] In about 1990, when the ABC leases were first being used, Amplicon even suggested to some salespeople they could reassure potential customers about the ABC lease by representing that they "never [had] seen a case" where a customer and Amplicon could not reach a mutually agreed price for purchase of the equipment. At trial, Amplicon's regional credit manager and former general counsel testified that such a statement, if made by salespeople, would be actually true and not deceptive since salespeople do not handle the end of term negotiations and thus would not know of such problems. He also noted the statement would have been correct in any event at the time it was suggested, because at that time, no ABC leases had yet reached the end of their terms.
[2] Apparently, Amplicon was hoping the customer would attribute the difference merely to changing T-bill rates over the time since the commitment letter had been executed. But if the customer was paying attention to the T-bill rates and noticed the "bump," an Amplicon sales manager suggested salespeople should describe the discrepancy as a "secretarial mistake."
[3] This situation would be analogous to one in which a boss sexually harasses an employee and thereafter attempts to kid around and be familiar with that employee. Although the boss's motivations might be innocent, an attempt to treat the employee like anyone else, the prior harassment would reasonably affect the employee's perception of what was going on.
[4] Respondents argue that McFetters' testimony that he had no intention of quitting at the beginning of his last day demonstrates that his working conditions could not have been intolerable prior to that time. Not true. The test of intolerable conditions is objective, not subjective. The fact that McFetters was willing to put up with the situation as long as he did may indicate nothing more than that he is a more tolerant and devoted employee than is the "reasonable person."
[5] In Green v. Ralee Engineering Co. (1998) 19 Cal.4th 66, 78 Cal.Rptr.2d 16, 960 P.2d 1046, the Supreme Court extended the definition of "public policy" beyond statutes and constitutional provisions, to include policies embodied in administrative regulations.
[6] The court characterized Amplicon's conduct as "sharp ... practice," rather than criminal conduct, in the apparent belief that such practice is acceptable. It is not. The phrase "sharp practice" means "dealing in which advantage is taken or sought unscrupulously." (Webster's 3d New Internat. Diet. (1981) p.2088.) A person who engages in "sharp practices" is not the negotiating equivalent of a sharp dresser. Thus, while we can agree with the court's characterization, we strongly dispute its conclusion.
[7] Civil Code section 1709 provides, "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damages which he thereby suffers."
[8] Penal Code section 484 provides in pertinent part, "[e]very person ... who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money ... is guilty of theft."
[9] An issue not raised by the parties is whether a cause of action for intentional infliction of emotional distress in the workplace is barred by the exclusive remedy of the workers' compensation law. In Cole v. Fair Oaks Fire Protection Dist. (1987) 43 Cal.3d 148, 233 Cal.Rptr. 308, 729 P.2d 743, the Supreme Court held that such claims are barred if the emotional distress results in physical injury. It left open the issue of whether purely emotional injuries, which are not compensable in workers' compensation, are likewise barred. Several Court of Appeal cases have held they are not. (See, e.g., Renteria v. County of Orange (1978) 82 Cal.App.3d 833, 838,'147 Cal.Rptr. 447.)
[10] We summarily reject McFetters' cursory contention that respondents' counsel acted improperly by prompting the court to prepare a written order granting the new trial and suggesting content for that order. Code of Civil Procedure section 657 states only that the court must prepare the order and that it cannot direct counsel to do so.
[11] In contrast to new trial motions, our research found relatively few cases involving appeals after the grant of a JNOV. None of those cases, other than Lippert, specifically addresses the issue of whether a cross-appeal from the initial judgment is proper. However, in virtually all of those cases, both before and after Lippert, the courts have accepted and considered such cross-appeals without question. (See Hasson v. Ford Motor Co. (1977) 19 Cal.3d 530, 138 Cal.Rptr. 705, 564 P.2d 857 [overruled on other grounds in Soule v. General Motors Corp. (1994) 8 Cal.4th 548, 572, 574-580, 34 Cal.Rptr.2d 607, 882 P.2d 298]; Hackethal v. National Casualty Co. (1987) 189 Cal.App.3d 1102, 234 Cal.Rptr. 853; Baker v. City of Los Angeles (1986) 188 Cal.App.3d 902, 233 Cal.Rptr. 760; Castro v. State of California (1981) 114 Cal.App.3d 503, 170 Cal.Rptr. 734; Widener v. Pacific Gas & Electric Co. (1977) 75 Cal.App.3d 415, 142 Cal.Rptr. 304 [disapproved on other grounds in McCoy v. Hearst Corp. (1986) 42 Cal.3d 835, 847, fn. 9, 231 Cal.Rptr. 518, 727 P.2d 711]; Henderson v. Security Nat. Bank (1977) 72 Cal.App.3d 764, 140 Cal.Rptr. 388; McGirr v. Gulf Oil Corp. (1974) 41 Cal.App.3d 246, 115 Cal.Rptr. 902; Dietrich v. Litton Industries, Inc. (1970) 12 Cal.App.3d 704, 90 Cal.Rptr. 856; Bufano v. City & County of San Francisco (1965) 233 Cal.App.2d 61, 43 Cal. Rptr. 223.)
[12] The language of rule 3(c) has been amended since the Lippert decision, but the changes are immaterial to our analysis.
[13] In Lippert, the court rejected the contention that a JNOV could be considered the same as the grant of a motion to vacate referred to in rule 3(c): "It is rather obvious that the two are not the same. The granting of a motion to vacate a judgment leaves no judgment at all. A judgment notwithstanding the verdict results in a judgment." (Lippert v. Avco Community Developers, Inc., supra, 60 Cal.App.3d at p. 780, 131 Cal.Rptr. 730.) In reaching that conclusion, however, the Lippert court seems to have ignored the fact that rule 3(c) makes explicit, and separate, reference to a "motion to vacate the judgment and enter another and different judgment."