[No. B041732. Second Dist., Div. Four. July 2, 1991.]

PATRICIA S. TEITEL, Plaintiff and Appellant, v.
FIRST LOS ANGELES BANK, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I and II.

1596

COUNSEL

Negele, Knopfler, Pierson & Robertson, James R. Negele and Arthur E. Schwimmer for Plaintiff and Appellant.

Manatt, Phelps, Rothenberg & Phillips, Alan I. Rothenberg, Robert E. Hinerfeld, Christopher G. Foster, Kevin F. Ruf, Latham & Watkins and Alan I. Rothenberg for Defendant and Appellant.

OPINION

**EPSTEIN, J.**—This appeal arises from a jury verdict in favor of Patricia S. Teitel against First Los Angeles Bank (Bank). Following a jury trial in which Teitel received a verdict of some $9,000 in general damages and $500,000 in punitive damages against Bank, the trial court denied a remittitur motion to alternatively reduce the amount of punitive damages or grant a new trial, but granted Bank's motion for judgment notwithstanding the verdict and, in so doing, purported to reduce the award of punitive damages from $500,000 to $50,000. Teitel contends that the trial court was without authority to reduce punitive damages by an order granting judgment notwithstanding the verdict, and that the order violated her constitutionally guaranteed right to jury trial. Bank urges us to affirm the trial court judgment on the ground that the original award was excessive as a matter of law. Alternatively, the Bank asks that we order a new trial conditioned on Teitel's refusal of a remittitur, the motion which was denied by the trial court.

We conclude that the trial court erred in selecting Bank's motion for judgment notwithstanding the verdict as the vehicle to reduce what it perceived as an excessive amount of punitive damages. Since the trial court expressly declined to grant the proper remedy of new trial subject to the condition that new trial would be denied if appellant consented to a remittitur, we cannot say how it would have ruled on that motion in light of the unavailability of judgment notwithstanding the verdict as a vehicle to reduce a damages verdict. We therefore reverse the judgment, reinstate the original judgment awarding Teitel $500,000 in punitive damages, and remand with directions to reconsider the Bank's motion for new trial on punitive damages conditioned on Teitel's acceptance of a remittitur. In light of this disposition, we do not address Teitel's constitutional argument, or the Bank's argument on cross-appeal that the award of punitive damages was excessive as a matter of law.

While Bank does not challenge the sufficiency of the evidence of liability, it contends in its cross-appeal that a new trial is required on both liability and damages because of evidentiary errors. We shall conclude that, to the degree that evidentiary error occurred, it was harmless.

FACTUAL AND PROCEDURAL HISTORY

Teitel, an attorney admitted to practice law in New York, moved to California in 1981 and was hired by Roger Hartman as his legal secretary. Teitel opened a personal checking account at the Century Park branch of Bank near Hartman's office. Teitel's duties included maintaining Hartman's books of account, writing his checks, and recording his checks in a ledger. Following her initial three months of employment, Teitel began performing paralegal duties for Hartman in connection with real estate syndications. She received extra compensation for these services.

On February 13, 1984, Hartman went to Bank and executed three affidavits of forgery, claiming that Teitel had signed his name without authority on three checks payable to herself.[1] The first was a check dated October 25, 1983, in the amount of $750; the second was a November 17, 1983, check in the amount of $600; and the third check was dated December 9, 1983, and was in the amount of $1,354.84. Hartman discharged Teitel on February 14, 1984, because of his belief that these checks were forged. Teitel was arrested the same day and charged with forgery after Bank reported the affidavits of forgery to the police. Teitel was never prosecuted.

Teitel did not deny that she had written the checks and that she had deposited them in her account. She contended that she did so with Hartman's authorization. Teitel explained that the check for $750 was a partial bonus for work she performed on a hotel deal, and that Hartman had authorized her to deposit this amount in her own account. She testified that Hartman had given her authorization by telephone to put his initials on each of the three checks. Teitel also testified that she drew the $600 check in her own handwriting, signed it with Hartman's name, and deposited it to her own account because it was money owed to her by Hartman on hotel deals.

Teitel testified that the check for $1,354.84 was her "average salary" check, which she prepared, signed with Hartman's name, and deposited to her own account. She stated that Hartman had signed a check in the amount

---

[1]Each check was payable to "Patricia S. Corso," Teitel's married name.

of $1,000 as an advance to her the same day. Teitel explained that she had prepared both checks and left them on Hartman's desk for signature, but that when she retrieved them she found that Hartman had signed only the check for $1,000.

Hartman's check ledger did not contain entries for either the October 25, 1983, check or the November 17, 1983, check. Hartman testified that he had refused several requests by Teitel that she be made an authorized signatory on his checking account. He denied having given her authority to sign a check on his account. Hartman testified that when he initially confronted Teitel, she denied signing the three checks. She then admitted she had signed the checks and challenged Hartman to say what he planned to do about it. Hartman testified that he told Teitel he was unsure about what action he would take.

Hartman executed the affidavits of forgery and presented them to Bank. The same day, personnel of Bank deducted the amount of the challenged checks from Teitel's personal account and credited Hartman's account with the same amount.[2] Bank also immediately reversed 40 checks drawn by Teitel on her personal account. Each of these checks already had cleared Teitel's account and had been paid. After the affidavits of forgery were received, these checks were variously stamped "insufficient funds," "uncollected funds" or "paid in error." The returned checks totalled more than $5,800, some $3,100 over the amount of the claimed forgeries. Bank stipulated that: "63. PATRICIA S. TEITEL was given no written notice of the reversal of any of the checks [returned on February 13] prior to their return through normal banking channels; 64. FIRST LOS ANGELES BANK does not have a written policy instructing . . . [an] employee to debit the checking account of [Teitel] upon receipt of an affidavit of forgery from Roger C. Hartman; 65. FIRST LOS ANGELES BANK has no written policy regarding the reversing of allegedly forged checks; 67. FIRST LOS ANGELES BANK is unaware of the person who gave the final approval to reverse the checks [drawn on Teitel's account]." On February 14, 1984, Barbara Poston, the Bank's assistant branch manager, wrote to Teitel, notifying her that Hartman had executed the allegations of forgery and requesting Teitel to contact the Bank. Poston's efforts to contact Teitel by telephone were unsuccessful.

Bank presented the testimony of four employees and officers. Although none of these witnesses accepted responsibility for Bank's conduct and none

---

[2]The parties stipulated to the actions taken by Bank following receipt of the affidavits. Our summary is based primarily on these stipulated facts.

could recall details of how Bank responded to the affidavits of forgery, each testified that he or she understood the actions taken by Bank to be consistent with standard banking industry practice.

Burton McCullough, an expert in banking law, testified on behalf of Teitel that Bank did not act within standard banking practice in withdrawing money from Teitel's account, replacing that amount in Hartman's account, and reversing checks drawn by Teitel on her personal account which Bank already had charged to that account. Bank presented the manager of a branch of Bank of America who testified that the contested actions were within standard banking procedures.

Teitel testified that she had incurred costs as a result of adverse actions taken by the payees on the checks reversed by Bank, including service charges imposed by merchants for the processing of the returned checks; a judgment obtained by Sears Roebuck in small claims court; the fee for restoration of her electrical service, which had been terminated; and transportation expenses following repossession of her automobile. Teitel claimed loss of employment for four months following her termination by Hartman during which she was occupied with attempting to restore her credit. Teitel also claimed lost wages she would have earned as a member of the California Bar and presented an expert witness who testified that Bank's cross-complaint against her in this action, alleging forgery, would have precluded her admission to the California Bar. Bank presented evidence that Teitel had not sought admission to the California Bar at any earlier point during her residency in California, and that the cross-complaint brought by Bank would not have barred her admission. Teitel filed bankruptcy shortly after she filed her action against Bank.[3]

Bank restored the disputed funds to Teitel's account in mid-April 1984, after Teitel executed an indemnity agreement demanded by Bank.

Teitel filed suit in February 1985, alleging causes of action for breach of contract, breach of the covenant of good faith and fair dealing, intentional infliction of emotional distress, conversion, wrongful dishonor of checks, violations of Financial Code sections 857 and 952, and negligence. Bank cross-complained, alleging that Teitel forged the disputed checks and that

---

[3]Bank contends that Teitel's bankruptcy was the result of other debts unrelated to any of the transactions related to the dishonor of her checks.

her lawsuit was barred by the indemnity agreement.[4] The jury rendered a general verdict in favor of Teitel in the amount of $9,193.50. The jury also made special findings that Bank had wrongfully dishonored Teitel's checks; that it improperly had placed and maintained a hold on her account; that it had breached its duty of good faith and fair dealing; that it had intentionally interfered with her property; and that Teitel was entitled to punitive damages.

During the punitive damages phase of the trial, Teitel presented a 1987 financial report which reflected that Bank had a net worth of $57,472,639 and a net pretax income of $7,548,378. A June 1988 interim report, also received in evidence, reflected a net worth of $59,579,895. Counsel for plaintiff suggested that the jury award 10 percent of Bank's net worth as punitive damages. The jury awarded Teitel $500,000 in punitive damages. Judgment was entered in the amount of $506,493.50, which reflected a stipulated setoff of $2,700.

Bank filed two timely posttrial motions. In its motion for new trial it contended: that the punitive damages award was not supported by substantial evidence; that the award was excessive as a matter of law; that the trial court had committed evidentiary errors; and that the jury should have been instructed on Teitel's unclean hands. Bank expressly invoked the remittitur procedure of Code of Civil Procedure section 662.5, subdivision (b), and asked the trial court to reduce the punitive damages award to $50,000.

Bank based its motion for judgment notwithstanding the verdict on the ground that the award of punitive damages was not supported by substantial evidence or, in the alternative, that the amount of punitive damages awarded was excessive as a matter of law. In its motion for judgment notwithstanding the verdict, Bank asked the trial court to either strike the award of punitive damages or to reduce the amount to $50,000.

At the hearing on the posttrial motions, counsel for Bank began his argument by asserting that the award of punitive damages was "absolutely unfounded." The trial court immediately disagreed: "I disagree about it being unfounded. I don't know what the bank was thinking about. At the status conference and at the MSC, I made it clear that I felt the bank was really

---

[4]The record reflects that the trial court dismissed the Bank's cross-complaint on plaintiff's motion for judgment on the pleadings. Bank presents no argument on appeal related to the merits of the cross-complaint.

heading into trouble. They were stonewalling. They didn't think they were doing anything wrong. [¶] You can't drive somebody into a bankruptcy and expect them to be very happy about it. You can't have your experts get up here and say that it is okay to violate banking regulations as long as the bank makes money. You can't have your experts, your own experts, get up here and say everything the bank did was right except they should have taken more precautions. [¶] It is a horrible case to try. I am surprised they didn't come in with more damages. However, I do agree the punitives are too high, and there is a request to lower it [to] $50,000."

The trial court ruled: "So, to the extent that you requested punitive damages be reduced to the sum of $50,000, that motion is granted." Clarifying the order, the trial court stated: "[t]he motion for new trial is denied. [¶] The punitive damages will be reduced to $50,000." The trial court's minute order stated: "Motion for new trial is argued and denied. [¶] In lieu of new trial, court reduces punitive damages to $50,000.00 in judgment not withstanding [sic ] the verdict." The proposed judgment prepared by counsel for Bank following the hearing on the posttrial motions stated that the court had granted a motion for new trial unless Teitel consented to a reduction of the punitive damages to $50,000. Counsel for Teitel objected to the proposed judgment on the ground that it was inconsistent with the minute order. Counsel for Bank subsequently filed a new proposed judgment consistent with the minute order which was signed by the trial court and entered. Teitel filed a timely notice of appeal, and Bank filed a timely notice of cross-appeal.

DISCUSSION

The principal issue on this appeal is whether the trial court erred in the method it selected for reducing the amount of punitive damages. In the published portion of this opinion, we conclude that it did. In the unpublished portion of this opinion, which precedes that discussion, we dispose of evidentiary issues which Bank contends require a new trial on liability and damages.

I, II*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

*See footnote, *ante*, page 1593.

## III

### *The Motion for Judgment Notwithstanding the Verdict*

■ Teitel contends that the trial court was without authority to reduce the punitive damages without her consent in granting the motion for judgment notwithstanding the verdict, that there was no basis on which the judgment notwithstanding the verdict could be granted, and that the trial court's order violated her right to a jury determination of her damages. Bank contends that the punitive damages were excessive as a matter of law, and that this court should exercise its inherent authority to reduce the award if the trial court's order cannot stand. Alternatively, Bank requests that we order a new trial on punitive damages conditioned on Teitel's refusal of a remittitur.[5]

As we now discuss, the trial court concluded that some award of punitive damages was warranted by the evidence but exercised the wrong remedy in reducing the verdict. The trial court expressly refused to grant a new trial conditioned on denial of such relief in the event that appellant consented to a remittitur, and instead, purported to reduce the award by a judgment notwithstanding the verdict.

The Legislature has codified two posttrial procedures that may be utilized when parties seek to obtain a judgment contrary to the verdict rendered by a jury. Both were invoked in this case. Code of Civil Procedure section 629 provides in pertinent part that the trial court "shall render judgment in favor of the aggrieved party notwithstanding the verdict whenever a motion for a directed verdict for the aggrieved party should have been granted had a previous motion been made." Code of Civil Procedure section 657, subdivision 5, provides that a trial court may grant a new trial on the ground of excessive damages. ■ That order may be made, subject to denial "if the party in whose favor the verdict has been rendered consents to a reduction of so much thereof as the court in its independent judgment determines from the evidence to be fair and reasonable." (Code Civ. Proc., § 662.5, subd. (b).) This procedure is known as "remittitur." (See Cal. Judges' Benchbook: Civil Trials, Cal. Center for Jud. Ed. & Research (1981) § 17.36, p. 562; see *Schelbauer* v. *Butler Manufacturing Co.* (1984) 35 Cal.3d 442, 452-453 [198 Cal.Rptr. 155, 673 P.2d 743, 38 A.L.R.4th 566].)

---

[5]Bank does not challenge the constitutionality of the award of punitive damages. (See *Pacific Mut. Life Ins. Co.* v. *Haslip* (1991) 499 U.S. __ [113 L.Ed.2d 1, 111 S.Ct. 1032] [due process challenge rejected].)

■ The trial court's discretion in granting a motion for judgment notwithstanding the verdict is severely limited. " 'The trial judge's power to grant a judgment notwithstanding the verdict is identical to his power to grant a directed verdict [citations]. The trial judge cannot reweigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. [Citations.] "A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied." [Citation.]' " (*Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865, 877-878 [151 Cal.Rptr. 285, 587 P.2d 1098], quoting *Hauter* v. *Zogarts* (1975) 14 Cal.3d 104, 110-111 [120 Cal.Rptr. 681, 534 P.2d 377, 74 A.L.R.3d 1282].)

■ "When reviewing the validity of a judgment notwithstanding the verdict, an appellate court must resolve any conflict in the evidence and draw all reasonable inferences therefrom in favor of the jury's verdict. [Citation.]" (*Czubinsky* v. *Doctors Hospital* (1983) 139 Cal.App.3d 361, 364 [188 Cal.Rptr. 685].)

■ We conclude that the motion for judgment notwithstanding the verdict should have been denied because there was substantial evidence to support a punitive damages verdict against Bank. "Punitive damages must be based on a showing of 'oppression, fraud, or malice.' (Civ. Code, § 3294.) ■ To be liable for punitive damages, defendant must act ' " 'with the intent to vex, injure, or annoy, or with a conscious disregard of the plaintiff's rights. [Citations.]' " ' [Citations.] These elements may be proven directly or by implication. [Citations.]" (*Colonial Life & Accident Ins. Co.* v. *Superior Court* (1982) 31 Cal.3d 785, 792 [183 Cal.Rptr. 810, 647 P.2d 86], italics deleted.) Moreover, "The jury could also properly find that its award of punitive damages was necessary not simply to punish defendant for past acts but also to get defendant to discontinue its deceptive practices . . . . The jury could . . . reasonably conclude its award of punitive damages was necessary in order to get defendant's attention." (*Moore* v. *American United Life Ins. Co.* (1984) 150 Cal.App.3d 610, 638 [197 Cal.Rptr. 878].)

■ The trial court recognized the existence of evidence supporting the award of punitive damages when it expressly repudiated Bank's argument

that the verdict was "absolutely unfounded." Teitel's expert witness, Burton McCullough, had impressive credentials in banking law. He had served as in-house counsel at Bank of America, specializing in the procedures for returning checks, including those believed to have been forged. He also had extensive experience as a lecturer to both attorneys and bank officers regarding banking procedures, and had testified as an expert witness in other cases involving banking practices.

McCullough testified that the Bank had violated standard banking procedures in several ways: (1) failing to investigate the validity of Hartman's affidavits of forgery; (2) immediately withdrawing the amount of the challenged checks from Teitel's account at the same branch instead of using funds from one of the Bank's own accounts; (3) immediately depositing that amount in Hartman's account; (4) returning 40 checks drawn by Teitel beyond the statutory deadline for such returns; (5) stamping these items, which already had been charged to Teitel's account, as returned for "insufficient funds," "uncollected funds" or "paid in error" which misrepresented the reason for the returns; and (6) failing to promptly notify Teitel of its actions. Bank stipulated to the facts upon which McCullough based his opinion.

At the relevant times in 1984, Donna Turner was Bank's senior vice-president in charge of operations for all the branches, a corporate-level position. In September 1984, after several discussions with Steven Wade, she approved and signed a charge-off request which purported to summarize the actions taken by Bank. The document stated that only two of Teitel's checks, totalling $1,060, had been returned beyond the statutory deadline for returns, to cover the transfer of the $2,700 from Teitel to Hartman's account. Turner knew that this statement was false when she signed the document.

At the time of trial, Steven Wade was still the manager of the Bank's Century City branch. He testified that he could not recall how many checks were returned late from Teitel's account, but that if a similar situation arose, he would handle it in nearly the same way the Hartman affidavits had been handled.

The trial court erred in granting the judgment notwithstanding the verdict in light of this evidence. The Legislature has provided an exclusive remedy for a trial court to employ where some damages are properly awarded, but the amount is excessive. That is through a remittitur pursuant to Code of

Civil Procedure section 662.5.[6] Were we to accept Bank's position that the trial judge is empowered to select an appropriate level of punitive damages and compel its determination by a judgment notwithstanding the verdict, we would find little or no purpose for the remittitur statute. We do not believe the Legislature intended such a result. Rather, the legislative system as enacted makes it plain that damages, except those which may be determined as a matter of law, are to be fixed by the trier of fact and, if erroneous in amount, subject to the reduction or new trial procedure specified in Code of Civil Procedure section 662.5, subdivision (b).

Our conclusion is reinforced by the legislative history of the new trial statute. ■ In 1965, Code of Civil Procedure section 657 was amended by the addition of substantially new procedures requiring trial courts to specify both the grounds upon which a motion for new trial is granted and the reason or reasons for granting the new trial upon each ground stated. "The rule serves the dual purposes of 'encouraging careful deliberation by the trial court before ruling on a motion for new trial, and of making a record sufficiently precise to permit meaningful appellate review.' (*Scala* v. *Jerry Witt & Sons, Inc.* [1970] 3 Cal.3d at p. 363 [90 Cal.Rptr. 592, 475 P.2d 864]; see also *Mercer* v. *Perez, supra,* 68 Cal.2d at pp. 112-113 [65 Cal.Rptr. 315, 436 P.2d 315].) The requirement applies equally to grants of conditional new trials. [Citation.]" (*Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 420 [185 Cal.Rptr. 654, 650 P.2d 1171].)

As applied to a remittitur motion, this procedure requires the trial court to provide a clearer exposition of the rationale for granting a new trial if the defendant requests an amount less than the verdict. This purpose would be undermined if the trial court could simply reduce punitive damages from one amount to another through a motion for judgment notwithstanding the verdict.

Appellant argues that the trial court's order granting the judgment notwithstanding the verdict and reducing the punitive damages award violated her constitutionally protected right to trial by jury. We need not reach this

---

[6]A judgment notwithstanding the verdict for an amount less than the jury verdict would seem appropriate where there can be no dispute as to the amount. Such an order might have been appropriate, for example, if Teitel were entitled to no punitive damages at all and the trial court had reduced the judgment to the adjudicated amount of compensatory damages. In this case, however, the jury and the court agreed that Teitel was entitled to some punitive damages. Quite obviously, there is no specific amount of such damages to which she was entitled as a matter of law.

argument because of our disposition reversing the judgment entered on the motion for judgment notwithstanding the verdict. (See *Ferguson* v. *Keays* (1971) 4 Cal.3d 649, 656, fn. 6 [94 Cal.Rptr. 398, 484 P.2d 70].) Moreover, appellant's right to trial by jury is not infringed by our order directing the trial court to reconsider the Bank's motion for new trial conditioned on denial if the appellant consents to a remittitur reducing the amount of punitive damages. (See *Tramell* v. *McDonnell Douglas Corp.* (1984) 163 Cal.App.3d 157, 173 [209 Cal.Rptr. 427].)

In light of our ruling, we decline the Bank's request that we affirm the reduction in the amount of the punitive damages under our "inherent power." The Bank relies upon three cases from this district, *Wollersheim* v. *Church of Scientology* (1989) 212 Cal.App.3d 872 [260 Cal.Rptr. 331], *Gerard* v. *Ross* (1988) 204 Cal.App.3d 968 [251 Cal.Rptr. 604], and *Allard* v. *Church of Scientology* (1976) 58 Cal.App.3d 439 [129 Cal.Rptr. 797], in arguing that we should reduce the punitive damages as excessive as a matter of law. In each of these cases, the Court of Appeal found that compensatory or punitive damages were excessive, selected its own number, and affirmed a judgment for the modified amount. Appellant argues that the Courts of Appeal have no authority to engage in such fact finding on appeal. We need not resolve that issue here. We have concluded that the trial court erred in employing the device of a judgment notwithstanding the verdict to reduce the amount of punitive damages. We decline to substitute our judgment regarding the appropriate amount of punitive damages. "The trial court is in a far better position than an appellate court to determine whether a damage award was influenced by 'passion or prejudice.' (Code Civ. Proc., § 657.) In reviewing that issue, moreover, the trial court is vested with the power, denied to us, to weigh the evidence and resolve issues of credibility." (*Schroeder* v. *Auto Driveaway Co.* (1974) 11 Cal.3d 908, 919 [114 Cal.Rptr. 622, 523 P.2d 662].)

In light of our order, it is not necessary to discuss the claimed inadequacies of appellant's proof to support the amount of punitive damages. (See *Tan Jay Internat., Ltd.* v. *Canadian Indemnity Co.* (1988) 198 Cal.App.3d 695, 704 [243 Cal.Rptr. 907].) Bank may raise this issue if it is dissatisfied with the trial court's order on remand.

## DISPOSITION

The trial court erred in granting the motion for judgment notwithstanding the verdict. We reverse the order granting that motion and reinstate the

original judgment on the jury's verdict; we also affirm the judgment with respect to Bank's cross-appeal and remand the cause with directions to reconsider the Bank's motion for a new trial on the issue of punitive damages subject to the condition that the motion for new trial be denied in the event that Teitel consents to such remittitur as the trial court may determine. (See *Krouse* v. *Graham* (1977) 19 Cal.3d 59, 81-83 [137 Cal.Rptr. 863, 562 P.2d 1022]; *Tan Jay Internat., Ltd.* v. *Canadian Indemnity Co.*, *supra*, 198 Cal.App.3d at p. 709.) We do not decide what amount of punitive damages is appropriate, leaving that decision to the trial judge through the remittitur procedure. Each side is to bear its own costs on appeal.

George, Acting P. J., and Goertzen, J., concurred.

A petition for a rehearing was denied July 24, 1991, and the petition of appellant Teitel for review by the Supreme Court was denied October 2, 1991. George, J., did not participate therein.