[No. D040473. Fourth Dist., Div. One. Mar. 1, 2006.]

DIANNE GOBER et al., Plaintiffs and Appellants, v.
RALPHS GROCERY COMPANY, Defendant and Appellant,

**[CERTIFIED FOR PARTIAL PUBLICATION¹]**

---

[1] Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part II.

**Counsel**

Horvitz & Levy, Daniel J. Gonzalez, Karen M. Bray, Curt C. Cutting; Ford & Harrison and Helene J. Wasserman for Defendant and Appellant.

Law Offices of Philip E. Kay, Philip E. Kay, Lawrence A. Organ; Rosen, Bien & Asaro, Sanford Jay Rosen, Sarah Olson Zimmerman, Ernest J. Galvan, Richard Hardack; John W. Dalton; Luce, Forward, Hamilton & Scripps and Charles A. Bird for Plaintiffs and Appellants.

## OPINION

**McINTYRE, J.**—In this sexual harassment case, juries have twice awarded plaintiffs substantial punitive damages. On this third appeal, we are faced with several issues, including whether the amount of punitive damages awarded by the second jury violates federal due process principles and whether this issue is properly before us on an appeal from an order denying defendant's request for judgment notwithstanding the verdict (JNOV). In the published part of this opinion, we answer the second question in the affirmative, conclude that the amount of punitive damages was constitutionally excessive and that the maximum award consistent with constitutional principles and the facts here is a ratio between punitive and compensatory damages set at six to one.

In the unpublished portion of this opinion, we address plaintiffs' contentions that the trial court should have awarded them postjudgment interest on the compensatory and punitive damages awarded to them.

### FACTUAL AND PROCEDURAL BACKGROUND

In August 1995, Terrill Finton, Dianne Gober, Sarah Lang, Talma (Peggy) Noland, Suzanne Papiro and Tina Swann (collectively, plaintiffs) were employees at a store operated by Ralphs Grocery Company (Ralphs) in Escondido when Roger Misiolek became the store director. While director of the Escondido store, Misiolek engaged in inappropriate touching, used profanity, made inappropriate comments on some plaintiffs' sex lives, and threw various objects at some plaintiffs.

Plaintiffs filed this action against Misiolek and Ralphs. After plaintiffs settled with Misiolek, the trial court bifurcated the trial against Ralphs and, at the end of the liability phase, the jury found that Ralphs failed to take reasonable steps to prevent Misiolek's gender based harassment and awarded the following compensatory damages: $50,000 to Noland, $62,500 to Finton, $62,500 to Lang, $75,000 to Papiro, $100,000 to Swann and $200,000 to Gober. The jury also determined that Misiolek was a managing agent of Ralphs and that Ralphs either ratified Misiolek's misconduct or had advance knowledge of his unfitness and employed him with a conscious disregard of the rights and safety of others. During the second phase of the trial, on the amount of punitive damages, the jury awarded a total of $3.3 million in punitive damages against Ralphs, specifically: $150,000 to Noland, $350,000 to Finton, $325,000 to Lang, $500,000 to Papiro, $700,000 to Swann and $1,300,000 to Gober.

The trial court granted Ralphs's motion for a new trial as to the amount of punitive damages, based on jury misconduct during deliberations. Ralphs

appealed arguing, among other things, that the punitive damage award was not supported by substantial evidence meeting the requirements of Civil Code section 3294, subdivision (b) and that the court improperly limited the grant of a new trial to the amount of punitive damages.

In our prior, unpublished opinion, we concluded that Misiolek was not a managing agent of Ralphs, but that substantial evidence supported a finding of liability against Ralphs for punitive damages based on evidence from which the jury could have inferred that Ralphs had advance knowledge of Misiolek's unfitness to serve as a store director and continued to employ him in conscious disregard of the right of its employees to be free from sexual harassment. (*Finton v. Ralphs Grocery Co.* (May 30, 2000, D031670) [nonpub. opn.].) We also held that the trial court did not err in limiting the new trial to the amount of punitive damages, noting that the parties would need to present evidence relating to the basis for imposing liability, as well as the amount to be awarded on retrial.

On retrial, a second jury awarded each of the six plaintiffs $5 million in punitive damages. After ruling on plaintiffs' motion for interest on their compensatory and punitive damage awards, the trial court entered judgment and Ralphs for moved JNOV and a new trial on the ground the punitive damage awards were excessive. The trial court denied the JNOV motion, but vacated the judgments and conditionally granted a new trial as to any plaintiff who did not consent to an award equal to 15 times her compensatory damage recovery. Gober and Swann accepted the remittiturs, but Finton, Lang, Noland and Papiro (collectively the Finton Plaintiffs) did not. All parties filed notices of appeal and Ralphs filed an interpleader action, paying Gober's and Swann's judgments into court.

The Finton Plaintiffs appealed from the new trial order and all plaintiffs appealed the denial of interest. Ralphs appealed the vacated judgment and challenged the constitutional propriety of the amount of the punitive damage awards by appealing the court's order denying its request for JNOV. Among other things, we concluded that the latter challenge was not properly brought by such an appeal, and affirmed the trial court's order conditionally granting a new trial on the amount of the punitive damages and dismissed Ralphs's purported appeal from the vacated judgment. (*Gober v. Ralphs Grocery* (Cal.App.).) All parties sought review. The Supreme Court denied plaintiffs' petition for review, but granted Ralphs's petition and transferred the matter to us for reconsideration in light of *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159 [29 Cal.Rptr.3d 379, 113 P.3d 63] (*Simon*).

In the published portion of this opinion we conclude that Ralphs may challenge the constitutional propriety of the amount of a punitive damages award on appeal from an order denying JNOV and remand the matter with directions to the superior court to enter a new judgment in the amount directed. This decision renders moot the Finton Plaintiffs' appeal from the new trial order.

In the unpublished portion of this opinion, we affirm the order denying postjudgment interest as to some plaintiffs, but reverse the order as to others and remand with instructions on calculating the amount of postjudgment interest.

## DISCUSSION

### I. *Ralphs's Appeal*

A. *Appellate Court Authority to Determine the Constitutional Limits on Punitive Damages Awards on Appeal from the Denial of a JNOV Motion*

Following retrial on remand, a second jury awarded each plaintiff $5 million in punitive damages, representing a ratio between punitive and compensatory damages ranging from 25 to one, to 100 to one. Comparing the total amounts of punitive damages and compensatory damages awarded results in a ratio of about 54 to one. Ralphs appealed the court's order denying its request for a JNOV setting punitive damages at the constitutional maximum. Ralphs contends that it should not be forced to undergo yet another retrial of the punitive damages issue, which may again result in a constitutionally unacceptable result. Ralphs asserts that the constitutional maximum cannot exceed three times the Finton Plaintiffs' compensatory damages awards, but represents that it is willing to forgo its right to a new trial and consent to a judgment awarding punitive damages in an amount less than 10 times the compensatory damages awards.

The Finton Plaintiffs agree that an appellate court has the power to decide the constitutional maximum of a punitive damages award, but argue that we cannot decide this issue on appeal from the denial of a motion for JNOV and any such decision would be unjust because the record is infected with a material evidentiary error. They contend that Ralphs could have, and should have, appealed from the order granting their new trial order.

As explained *post*, we conclude that Ralphs could not have appealed from the order granting the new trial, that the constitutional maximum of a punitive damages award can be decided on appeal from the denial of a motion for

JNOV and that deciding this issue on the present record is not unjust. Although the Finton Plaintiffs also complain that Ralphs made its consent to a judgment conditional on our deciding not to set the constitutional maximum at a ratio higher than nine to one, we need not address this complaint because we conclude the appropriate ratio is six to one.

1. *Ralphs Could Not Have Appealed from the Order Granting Its New Trial Motion Because It Was Not Aggrieved*

■ An appeal lies from an order granting a new trial (Code Civ. Proc., §§ 904.1, subd. (a)(4), 904.2, subd. (e), 657; all undesignated statutory references are to the Code of Civil Procedure) and any party "aggrieved" by the new trial order may appeal. (§ 902.) A party is not aggrieved by a judgment or order rendered in its favor. (*Nevada County Office of Education v. Riles* (1983) 149 Cal.App.3d 767, 779 [197 Cal.Rptr. 152].) Here, Ralphs requested that the trial court remit the punitive damages awards to amounts three times plaintiffs' compensatory damages awards or alternatively that it be granted a new trial. The trial court granted its request for a new trial conditioned on plaintiffs' accepting a remittitur of their punitive damages awards to amounts 15 times their respective compensatory damages awards.

Although the trial court did not grant all the relief that Ralphs requested (i.e., requested maximum of three to one rather than the awarded 15 to one ratio), Ralphs was not aggrieved because it received the new trial order that it requested and this court could only set a lower remittitur amount, which the Finton Plaintiffs would have again rejected. Notably, Gober and Swann accepted the remittitur and the trial court entered modified judgments as to these plaintiffs. While Ralphs could have appealed from the judgments entered as to Gober and Swann, it chose to pay the judgments and end the litigation as to these plaintiffs.

2. *The Constitutional Maximum of a Punitive Damages Award Can Be Decided on Appeal from the Denial of a Motion for JNOV*

■ A trial court has the statutory authority to grant both a motion for JNOV and motion for new trial. (§ 629.) On appeal, the new trial order is effective only if the ruling granting the JNOV is reversed. (*Ibid.*) As explained *ante*, Ralphs could not have appealed the granting of its new trial motion. Ralphs, however, could properly appeal the denial of its JNOV motion despite the grant of its new trial motion. (§ 629.) Ralphs contends that because the denial of its JNOV motion is appealable, it is entitled to a determination of the constitutional maximum punitive damages amount and that the Finton Plaintiffs should not be able to deprive it of this determination by refusing the remittitur and forcing a third trial on the punitive damages issue. We agree.

Relying on *Teitel v. First Los Angeles Bank* (1991) 231 Cal.App.3d 1593 [282 Cal.Rptr. 916] (*Teitel*), the Finton Plaintiffs assert that the trial court could not have granted Ralphs's JNOV motion. In *Teitel*, the defendant moved for JNOV on the ground that the punitive damages award was not supported by substantial evidence and was excessive as a matter of law, asking the trial court to strike or reduce the award. (*Teitel, supra,* 231 Cal.App.3d at pp. 1600, 1602.) The defendant also sought a new trial or alternatively that the court reduce the amount of punitive damages on the same grounds as well as based on alleged evidentiary and instructional errors. (*Id.* at p. 1600.) The trial court denied the new trial requests, but granted the defendant's motion for JNOV and reduced the punitive damages award. (*Ibid.*)

The appellate court concluded that the trial court erred in granting a JNOV and reducing the punitive damages award because "damages, except those which may be determined as a matter of law, are to be fixed by the trier of fact and, if erroneous in amount, subject to the reduction or new trial procedure specified in Code of Civil Procedure section 662.5, subdivision (b)." (*Teitel, supra,* 231 Cal.App.3d at p. 1605.) Concluding that the *Teitel* plaintiff was entitled to some punitive damages and that there was no specific amount of such damages to which she was entitled as a matter of law, the appellate court reversed the granting of the JNOV and remanded the matter with directions to the trial court to reconsider the defendant's motion for a new trial. (*Id.* at pp. 1605, fn. 6, 1607.) Significantly, although the defendant in *Teitel* argued that the punitive damages award was excessive, it did *not* challenge the constitutionality of the award. (*Id.* at p. 1602 & fn. 5.)

■ Since the decision in *Teitel* in 1991, the United States Supreme Court has ruled that state and federal appellate courts must conduct a de novo review of punitive damages awards challenged as being constitutionally excessive. (*State Farm Mut. Auto Ins. Co. v. Campbell* (2003) 538 U.S. 408, 418 [155 L.Ed.2d 585, 123 S.Ct. 1513] (*State Farm*); *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) 532 U.S. 424, 433–434 [149 L.Ed.2d 674, 121 S.Ct. 1678] (*Cooper Industries*).) In mandating a de novo review, the court reasoned that " '[u]nlike the measure of actual damages suffered, which presents a question of historical or predictive fact, . . . the level of punitive damages is not really a 'fact' 'tried' by the jury.' " (*Cooper Industries, supra,* 532 U.S. at p. 437, quoting *Gasperini v. Center for Humanities, Inc.* (1996) 518 U.S. 415, 459 [135 L.Ed.2d 659, 116 S.Ct. 2211] (dis. opn. of Scalia, J.).)

The court explained that although a jury's valuation of the extent of a plaintiff's injury is a factual determination, a punitive damages award is not a finding of fact, but rather an expression of moral condemnation. (*Cooper Industries, supra,* 532 U.S. at p. 432.) Because punitive damages do not

compensate a plaintiff for actual harm suffered, they must bear a reasonable relationship, and be proportionate, to compensatory damages. (*State Farm, supra*, 538 U.S. at p. 410; *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 580 [134 L.Ed.2d 809, 116 S.Ct. 1589] (*BMW*).) In *State Farm* the court refused to draw a bright line regarding the proper ratio of compensatory to punitive damages, but suggested that the ratio should generally be no higher than four to one and almost never more than nine to one. (*State Farm, supra*, 538 U.S. at p. 425.)

Recently, the California Supreme Court followed *State Farm* and *Cooper Industries*, holding that the constitutional excessiveness of a punitive damages award presents a legal issue that appellate courts could determine independently. (*Simon, supra*, 35 Cal.4th at p. 1187.) In *Simon*, our high court concluded that a punitive damages award was grossly excessive and ordered an absolute reduction to the constitutionally allowed maximum, rather than a conditional reduction with the alternative of a new trial, i.e., a remittitur. (*Ibid.*) Although the Supreme Court could have remanded the matter to the Court of Appeal with directions for that court to reduce the award to the constitutionally allowed maximum, it decided the issue because the litigation was over eight years old and included two trips to the United States Supreme Court and three decisions by the Court of Appeal. (*Ibid.*)

*Simon* was decided on appeal from a judgment entered upon retrial of a punitive damages award. (*Simon, supra*, 35 Cal.4th at p. 1170.) Here, there is no judgment on the punitive damage awards for the Finton Plaintiffs because it was set aside when the order granting a new trial took effect. (*Chodos v. Superior Court* (1964) 226 Cal.App.2d 703, 714–715 [38 Cal.Rptr. 301].) The Finton Plaintiffs nonetheless claim that the constitutional maximum of a punitive damages award is not presented on appeal without a judgment. This argument lacks merit because a party may appeal the denial of a JNOV even where a new trial was granted and the judgment vacated. (§ 629.)

The Finton Plaintiffs also argue that we cannot decide the constitutional maximum of a punitive damages award on appeal from the denial of a motion for JNOV because the trial court could not have granted a directed verdict on this issue and it is up to the jury to decide the truth of the facts and then make an award. (§ 629 ["The court . . . shall render judgment in favor of the aggrieved party notwithstanding the verdict whenever a motion for a directed verdict for the aggrieved party should have been granted had a previous motion been made"].) However, the Finton Plaintiffs lose sight of the fact that a jury determined the amount of punitive damages to be awarded and the only question here is whether those awards were constitutionally excessive.

■ In *Simon*, the California Supreme Court followed the lead of the federal courts by impliedly recognizing that a constitutionally reduced punitive damages verdict does not violate a plaintiff's Seventh Amendment right to a jury trial because the maximum constitutional award presents a question of law rather than a question of fact. (*Simon, supra*, 35 Cal.4th at p. 1187, citing *Johansen v. Combustion Engineering, Inc.* (11th Cir. 1999) 170 F.3d 1320, 1331 (*Johansen*).) In *Johansen*, the federal district court reduced a punitive damages award to the maximum that due process allowed under rule 50 of the Federal Rules of Civil Procedure, which allows a judgment to be entered as a matter of law, and entered judgment in that amount without allowing the plaintiffs an opportunity to elect a new trial. (*Johansen, supra*, 170 F.3d at pp. 1327, 1331.) As the *Johansen* court explained: "A constitutionally reduced verdict . . . is really not a remittitur at all. A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages. The court orders a remittitur when it believes the jury's award is *unreasonable* on the facts. A constitutional reduction, on the other hand, is a determination *that the law does not permit the award.* Unlike a remittitur, which is discretionary with the court . . . a court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause. [Citation.]" (*Johansen, supra*, 170 F.3d at p. 1331, fn. omitted, second italics added.)

Thus, in deciding the constitutional maximum, a court does not decide whether the verdict is unreasonable based on the facts; rather, it examines the punitive damages award to determine whether it is constitutionally excessive and, if so, may adjust it to the maximum amount permitted by the Constitution. This determination does not implicate the Finton Plaintiffs' right to have a jury decide their punitive damages claims. (*Simon, supra*, 35 Cal.4th at p. 1187.) Significantly, the Finton Plaintiffs concede (as they must) that an appellate court has the power to decide the constitutional maximum of a punitive damages award.

Moreover, "[o]nce a maximum constitutional award has been determined . . . a new trial on punitive damages would be futile. 'Giving a plaintiff the option of a new trial rather than accepting the constitutional maximum for this case would be of no value. If, on a new trial, the plaintiff was awarded punitive damages *less* than the constitutional maximum, he would have lost. If the plaintiff obtained *more* than the constitutional maximum, the award could not be sustained.' " (*Simon, supra*, 35 Cal.4th at p. 1188, italics in original, quoting *Johansen, supra*, 170 F.3d at p. 1332, fn. 19; accord, *Ross v. Kansas City Power & Light Co.* (8th Cir. 2002) 293 F.3d 1041, 1050 ["The plaintiff's consent to a constitutional reduction of a punitive damages award is 'irrelevant' because the court must decide this issue as a matter of law"].)

The parties have already participated in two lengthy trials resulting in excessive punitive damages awards and it is likely that a third trial on this issue may again result in excessive awards. Ralphs, which granted a new trial on this issue by the trial court, is willing to forgo its right to a new trial and end this litigation by agreeing to a punitive damages verdict set at the constitutional maximum. Under these facts there is no reason a trial or appellate court cannot decide to strike the portion of the punitive damages that is constitutionally excessive in the context of a JNOV motion and enter a verdict on this new amount.

### 3. Deciding the Constitutional Maximum of the Punitive Damages Awards on the Present Record is Not Unjust

The Finton Plaintiffs contend that the trial court erroneously precluded the introduction of additional evidence pertaining to the reprehensibility of Ralphs's conduct and these errors make it unjust to decide the constitutionality of the punitive damages awards. Specifically, they argue that they should be permitted to introduce evidence of Misiolek's misconduct prior to his transfer to the Escondido store and Ralphs's reaction thereto that was not presented or was excluded by the trial court during the liability trial.

However, the Finton Plaintiffs' argument is based on the assumption that the admission of this additional evidence would result in a ratio of punitive and compensatory damages that was more favorable to them than the range of 25 to one to 100 to one awarded by the last jury. Because ratios exceeding nine to one are presumptively unconstitutional absent extraordinary factors and, as discussed, *post*, this case does not present such extraordinary factors justifying punitive damages in excess of a single-digit ratio, the Finton Plaintiffs were not prejudiced by the exclusion of this additional evidence and retrial is not necessary to protect their interests.

### B. Determination of the Maximum Constitutionally Permissive Punitive Damages Award

### 1. The Guideposts

To determine the constitutional limits of a punitive damages award in any given case, we look to three "guideposts" articulated by the United States Supreme Court: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." (*State Farm, supra*, 538 U.S. at p. 418, citing *BMW, supra*, 517 U.S. at p. 575.) In determining whether a particular award

is constitutional, we exercise de novo review by independently accessing these factors. (*Simon, supra,* 35 Cal.4th at p. 1172.) Findings of historical fact are accepted as true so long as they are supported by substantial evidence. (*Ibid.*) In this regard, we focus on the evidence supporting the jury's findings that Ralphs had advance knowledge of Misiolek's unfitness, employed him with a conscious disregard of the rights and safety of others and failed to take reasonable steps to prevent his gender-based harassment.

## 2. The Pertinent Facts

We note that the reprehensibility of Misiolek's conduct is not at issue here; the question is how reprehensible Ralphs's behavior was vis-à-vis the Finton Plaintiffs. Thus, we focus on what Ralphs knew or should have known and what it did or failed to do, as these are the considerations relevant to our evaluation of the constitutional limits on the punitive damages awards. Because we discussed the supporting evidence at length in our first opinion, we will only briefly summarize key points to provide a general background for our discussion of the guidepost factors.

In the Ralphs grocery company, the highest onsite position at an individual store is that of store director. Among other things, the store director is responsible for disciplining employees and complying with the company's policies and standards within the store. Below the store director is the store's operations manager. Above the store director is the district manager, who is in charge of several stores. The district manager has authority to transfer individuals from store to store within certain limits and acts as a liaison to upper management for the operation of the stores within the manager's district. The district manager reports to the division or group vice-president of store operations.

### a. Misiolek's Misconduct at Prior Store Locations

Before Misiolek arrived at the Escondido store where the Finton Plaintiffs worked, he engaged in a series of abusive behaviors at the Grossmont and Sports Arena stores. At the Grossmont store, Misiolek threw a telephone at a female substitute bookkeeper while she was standing in the doorway to his office. Although she informed her store director of the incident, the director did not offer to file a complaint on her behalf and she did not request that a complaint be filed. This same employee later worked under Misiolek at the Sports Arena store, where Misiolek subjected her and others to profanity. Misiolek also hurled a hard plastic shield about the size of an envelope at the bookkeeper's face while they were at a check stand. The bookkeeper complained to the operations manager, who helped her avoid contact with Misiolek until she was eventually transferred to another store, away from Misiolek.

At the Sports Arena store, Misiolek placed his arms around the shoulders of a female employee and kept her alone in his office for prolonged periods of time. The employee reported the behavior to the Sports Arena operations manager, who offered to file a complaint on her behalf with upper management. The employee did not report the incident to the district manager, Jerry Smith.

Misiolek also used profanity in front of customers and berated and mistreated the female service deli manager at the Sports Arena store. The deli manager met with her supervisor and Smith about transferring to a different store, but did not remember if Smith asked why she wanted the transfer. Smith stated he was unaware of her complaints and believed that she wanted the transfer because she was having operational and personnel problems at the Sports Arena store.

Over a year after plaintiffs filed this action, this employee gave Smith a list documenting Misiolek's misconduct at the Sports Arena store. Smith testified that on his visits to the stores he had observed Misiolek being abrupt and abrasive, yet no one had complained to him about this conduct. He testified that the only complaint he had heard about Misiolek at the Sports Arena store was from the service deli manager about making a sandwich for Misiolek. When interviewed following the report of sexual harassment at the Escondido store, Smith stated he was aware of three complaints against Misiolek. Two were from customers, and an employee other than the service deli manager made the third.

b. *Misiolek's Misconduct at the Escondido Store*

While director of the Escondido store, Misiolek would grab the plaintiffs by their waists or faces and touched or tried to touch their breasts. He also used profanity, inappropriately commented on some of their sex lives, and threw various objects at some of them. In April 1996, Gober's husband complained to Ralphs's senior vice-president of human resources about the sexual harassment that Gober had suffered. Neither Gober nor any of the other plaintiffs had made any prior complaints to Ralphs's management about Misiolek's conduct.

c. *Ralphs's Conduct Following Gober's Report*

The day after receiving Gober's complaint, Ralphs moved Misiolek out of the Escondido store while it investigated the allegation. Misiolek denied the allegations. Within a week of Gober's complaint, Ralphs's management interviewed each of the plaintiffs at the Escondido store, other employees at the Escondido store, Misiolek's current and past superiors and Misiolek's

operations managers at the Escondido and Sports Arena stores. Ralphs's management concluded that the complaints had merit and in May 1996, met with Misiolek and presented him with a written memorandum concerning his inappropriate physical touching and profanity toward female employees, as well as his harassment and harsh treatment of customers.

The memorandum stated Misiolek had undergone professional counseling and had been counseled to follow Ralphs's management guidelines and sexual harassment policy. It also stated Misiolek would be reassigned to another store "to provide an opportunity for [him] to demonstrate that he has considered the seriousness of his counseling and made corrective adjustments to his management style." Misiolek signed a statement on the memorandum indicating that he understood he had been put on notice and "that failure to bring about immediate and substantial improvement in the areas discussed [would] result in further disciplinary action, up to and including termination." After signing the written warning and acknowledging that if he did not improve he could face further discipline, including termination, Misiolek was escorted into the office of the senior vice-president of store operations, who stressed the seriousness of the matter to Misiolek. Misiolek testified there was no mention of the possibility of discipline or termination at the meeting.

Ralphs transferred Misiolek to a store in Mission Viejo, intending his longer commute time to be a form of punishment; however, Ralphs's management did not inform the Mission Viejo operations manager about the reason for the transfer. The Mission Viejo operations manager began receiving complaints from employees about Misiolek's temper, use of profanity and habit of throwing things, although there were no complaints about inappropriate touching. In December 1996, the Mission Viejo operations manager reported the complaints she had received to the district manager and asked that Misiolek be removed from the store because he would not stop his offensive conduct. In September 1997, a customer complaint about Misiolek prompted another investigation by Ralphs. After finding problems in the store displays and produce department, Ralphs's management wrote a memo to the district manager stating that Misiolek needed to improve his performance or face removal from management; it also placed a copy of the memo in Misiolek's personnel file.

In late November 1997, Ralphs's management met with Misiolek and informed him of the problems at the Mission Viejo store, including complaints from dissatisfied customers and employees. In December 1997, Ralphs's management demoted Misiolek from store director to food clerk and reassigned him to work as a merchandise receiver in the warehouse of another store. Management also cut Misiolek's pay in half and took away any opportunity for him to advance in the company.

### 3. *Application of the Three "Guideposts" to Ralphs's Conduct*

#### a. *Degree of Reprehensibility*

The degree of reprehensibility of the defendant's conduct is the most important indicium of the reasonableness of a punitive damages award. (*State Farm*, *supra*, 538 U.S. at p. 419.) To assess this factor, courts must consider whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." (*Ibid.*)

In our first opinion, we concluded that a reasonable jury could find that Ralphs, through its managing agent, Smith, had knowledge of Misiolek's inappropriate conduct prior to his becoming store director at the Escondido store and continued to employ him as a store director in conscious disregard of the rights of Ralphs's employees to be free from sexual harassment. Thus, Ralphs acted in a reprehensible manner by failing to appropriately respond to Misiolek's actions *before* he became the director of the Escondido store.

To evaluate the reprehensibility of Ralphs's conduct, we must first examine Misiolek's behavior because certain of his actions directly resulted in actual or potential physical harm to the Finton Plaintiffs. The bulk of the harm caused by Misiolek, however, was in the nature of emotional injury and although Misiolek's actions were egregious, they did not threaten life and limb. Ralphs's management immediately responded to Gober's complaint, transferring Misiolek and thereby protecting the Finton Plaintiffs from future harm. Ralphs's management also disapproved and repudiated Misiolek's conduct and instituted additional sexual harassment training and a zero tolerance policy, making it clear such complaints should be reported to management.

However, although Ralphs acted promptly in response to Gober's complaint, its inaction upon learning of Misiolek's *earlier* misconduct at other stores directly subjected the Finton Plaintiffs to potential physical harm by him. Within the spectrum of possible conduct under the first subfactor (i.e., from no potential or actual physical harm, to a defendant purposefully threatening the lives of the innocent), we conclude Ralphs's actions are on the mitigated side of the continuum. Therefore, with respect to the first subfactor, Ralphs's conduct appears to be of only a modest degree of reprehensibility.

Ralphs's conduct evinced some indifference to the health and safety of its employees because it knew of Misiolek's misconduct at the Grossmont and

Sports Arena stores, but failed to address it or to actively monitor Misiolek's conduct thereafter. However, in comparison to other cases involving punitive damages, the jeopardy in which Ralphs placed the Finton Plaintiffs was not dire. In contrast, in *Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640 [26 Cal.Rptr.3d 638], the California Court of Appeal concluded that the behavior of a cigarette manufacturer was "extremely reprehensible" because, "[i]n addition to fraud, the evidence establishe[d] that [it] acted with a conscious disregard of consumer health and safety in the manufacture and marketing of a dangerous product, and intentionally took advantage of the consumer expectation that 'light' cigarettes were safer." (*Boeken v. Philip Morris, Inc., supra,* 127 Cal.App.4th at p. 1692.) Unlike our case, the defendant in *Boeken* had deliberately exploited consumer ignorance to reap profits despite the fact that smokers, including the plaintiff, were developing aggressive and fatal forms of lung cancer. (*Id.* at pp. 1690–1694, 1673.) Thus, in *Boeken,* this dynamic suggested a high degree of reprehensibility and thus supported a nine to one punitive damages ratio. (*Id.* at p. 1703.) Here, although Ralphs's failure to properly redress Misiolek's behavior threatened the health of some of its workers, the risk of serious injury was relatively low, representing only a modest degree of reprehensibility.

The third subfactor, whether the victims were financially vulnerable, supports the conclusion that Ralphs's conduct was reprehensible to a certain degree. In *Simon,* the parties disputed whether the victim, the owner of a paper supply company who was preparing to purchase an office building for $1.2 million, was financially vulnerable as compared to the defendant, a bank subsidiary, and assessed this factor as "essentially neutral." (*Simon, supra,* 35 Cal.4th at pp. 1167–1168, 1180.) If the financial vulnerability subfactor with respect to the victim in *Simon* was neutral, it follows that this subfactor militates in favor of a modest degree of reprehensibility here, where the victims were a group of grocery store employees that relied on their jobs with Ralphs for their livelihoods.

Under the fourth subfactor, conduct that is recidivistic can be punished more harshly than an isolated incident. (*State Farm, supra,* 538 U.S. at p. 423.) The wrongful conduct in *State Farm* involved a series of unreasonable decisions that an insurer's employees made in handling the plaintiffs' specific insurance claim. (*Id.* at pp. 419–420.) Although the plaintiffs attempted to establish that the insurer had a nationwide policy for minimizing claims, our high court noted that they had produced "scant evidence of repeated misconduct of the sort that injured them" and concluded that the high punitive damages award could not be justified on the grounds that the insurer was a recidivist. (*Id.* at p. 423.) Similarly, the defendant's conduct in *BMW* was held not recidivistic even though it involved a car manufacturer defrauding hundreds of car purchasers, including the plaintiff, by selling repainted cars as "new" where the manufacturer did not know that its conduct was unlawful and

did not "persist[] in a course of conduct after it had been adjudged unlawful on even one occasion, let alone repeated occasions." (*BMW, supra*, 517 U.S. at pp. 563–564, 576–579, fn. omitted; accord, *Simon, supra*, 35 Cal.4th at p. 1180 [defendant made false promises in connection with a single transaction but no evidence showed similar conduct toward others].)

Here, Ralphs knew about Misiolek's misconduct at the Grossmont and Sports Arena stores and did not discipline him, but rather transferred him, thereby allowing him to continue his conduct at the Escondido store undeterred. However, when Gober's husband complained about Misiolek's conduct, Ralphs's management took immediate action, implementing progressive discipline to address new instances of misconduct by Misiolek and ultimately demoting him to a food clerk. As found by the jury, Ralphs's initial responses to Misiolek's behavior were unreasonable. Ralphs's mishandling of Misiolek's misconduct, however, does not satisfy the recidivistic subfactor of *BMW* and *State Farm*. In awarding or reviewing punitive damages, a court may consider whether "the defendant's illegal or wrongful conduct toward others . . . was similar to the tortious conduct that injured the plaintiff or plaintiffs." (*Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191, 1204 [29 Cal.Rptr.3d 401, 113 P.3d 82].) Ralphs's wrongful conduct was its failure to adequately address Misiolek's misbehavior, but there is no evidence that Ralphs acted similarly toward other individuals in its company who committed sexual harassment. Thus, Ralphs's conduct was not repetitive so as to suggest extreme reprehensibility.

The Finton Plaintiffs argue that we should consider Ralphs's continued failure to protect *other employees* from Misiolek after he left the Escondido store as evidence of recidivism. We disagree. In calculating punitive damages, courts cannot adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis; rather, a defendant should be punished for the conduct that harmed the plaintiff. (*State Farm, supra*, 538 U.S. at p. 423.) Thus, the concept of evaluating "recidivism" in connection with punitive damages pertains to assessing the existence and frequency of similar *past* conduct because this may be relevant to the determination of the degree of reprehensibility of the defendant's conduct. (*BMW, supra*, 517 U.S. at pp. 574, fn. 21, 576–577.)

The Finton Plaintiffs also contend that Ralphs's conduct resulted from intentional malice and deceit and not mere accident based on our conclusion that Ralphs acted with conscious disregard for the rights and safety of its employees. "Malice" is "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1).) Although we concluded that the

evidence supported the jury's finding that Ralphs's knowledge of Misiolek's inappropriate conduct prior to his becoming the Escondido store director and continued employment of him as a store director displayed a conscious disregard of the rights of its employees to be free from sexual harassment, the jury made no finding that Ralphs *intended* to cause injury to the plaintiffs and the Finton Plaintiffs have presented no evidence supporting such a conclusion. As such, Ralphs's conduct did not reveal extreme reprehensibility.

On balance, review of the five reprehensibility factors suggests Ralphs acted with a modest degree of reprehensibility.

b. *Ratio of Punitive Damages to Actual or Potential Harm*

The "most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." (*BMW, supra*, 517 U.S. at p. 580.) Although this ratio is not "marked by a simple mathematical formula" (*State Farm, supra*, 538 U.S. at p. 424, citing *TXO Production Corp. v. Alliance Resources Corp.* (1993) 509 U.S. 443, 458 [125 L.Ed.2d 366, 113 S.Ct. 2711]), the United States Supreme Court has decreed that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process" and has cautioned that a 4 to 1 ratio "might be close to the line of constitutional impropriety." (*State Farm, supra*, 538 U.S. at p. 425.) Nonetheless, extraordinary factors, such as extreme reprehensibility or unusually small, hard-to-detect or hard-to-measure compensatory damages, may justify punitive damages in excess of a single-digit ratio. (*State Farm, supra*, 538 U.S. at p. 425; *Simon, supra*, 35 Cal.4th at p. 1182.)

This case does not contain any of the factors justifying more than a single-digit ratio between punitive and compensatory damages. Ralphs did not act with extreme reprehensibility and the damages were not unusually small, hard to detect or hard to measure. The Finton Plaintiffs received compensatory damages ranging from $75,000 to $50,000, awards that cannot be characterized as nominal. Additionally, Misiolek's conduct did not result in significant personal injury or a *substantial* threat to the health and safety of the Finton Plaintiffs. As a result, a large multiplier cannot be justified against Ralphs.

c. *Comparable Civil Penalties*

The final guidepost requires us to compare the difference between the punitive damages awarded by the jury and other civil penalties authorized or imposed in comparable cases. (*State Farm, supra*, 538 U.S. at p. 428.) Here, Ralphs could have been required to pay a combination of actual damages and

administrative fines not exceeding $150,000 per aggrieved person. (Gov. Code, § 12970, subd. (a)(3).) Since the compensatory damages for the Finton Plaintiffs totaled $250,000, any fine could not exceed $350,000, or 1.4 times their compensatory damages. We reject the Finton Plaintiffs' suggestion that because the fine could be imposed "per aggrieved person" (Gov. Code, § 12970, subd. (c)), Ralphs's potential exposure was huge because Misiolek harassed so many people. While this may be true in the administrative arena, the *State Farm* court cautioned that a defendant "should be punished for the conduct that harmed the plaintiff" and that "[d]ue process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis . . . ." (*State Farm, supra,* 538 U.S. at p. 423.) As such, the hypothetical claims of other potential plaintiffs cannot be used to increase the Finton Plaintiffs' punitive damages awards.

d. *Conclusion*

■ Based on the foregoing factors, we conclude that a six to one ratio of punitive to compensatory damages is sufficient to punish Ralphs and deter it and others from similar conduct in the future. This ratio is also reasonable and proportionate to the amount of harm suffered and to the compensatory damages that the Finton plaintiffs recovered, which already contained a punitive element. (*State Farm, supra,* 538 U.S. at p. 426 [compensatory damages for emotional distress already contain a punitive element].) Although Ralphs is a multi-billion-dollar company, the size of the resulting awards will be substantial and even a wealthy company such as Ralphs is entitled to due process. (*Simon, supra,* 35 Cal.4th at pp. 1185–1186.)

■ We stress that the six to one ratio is not the amount we believe the jury should have awarded, what we would have awarded had we been the trier of fact or what ratio will always be appropriate under similar facts; rather, this ratio is the absolute constitutional maximum that could possibly be awarded under these particular facts. (*Simon, supra,* 35 Cal.4th at p. 1188 ["constitutional mission is only to find a level higher than which an award *may not* go; it is not to find the 'right' level in the court's own view"].)

II. *Plaintiffs' Appeal Regarding the Calculation of Interest**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The order denying Ralphs's motion for a judgment notwithstanding the verdict is reversed and the matter is remanded to the trial court with

---

*See footnote, *ante,* page 204.

directions that it enter a judgment for the Finton Plaintiffs by reducing the award of punitive damages to six times their respective compensatory damages awards. The Finton Plaintiffs' appeal from the new trial order is dismissed as moot.

The order denying the award of postjudgment interest is affirmed as to the Finton Plaintiffs and reversed as to Gober and Swann. The trial court is directed, upon proper motion, to award Gober and Swann postjudgment interest on their compensatory and punitive damages awards. Gober and Swann are entitled to their costs on appeal. Ralphs is entitled to its costs on appeal as to the Finton Plaintiffs.

Huffman, Acting P. J., and McDonald, J., concurred.

A petition for a rehearing was denied March 22, 2006, and the opinion was modified to read as printed above. The petition of plaintiffs and appellants for review by the Supreme Court was denied June 14, 2006, S142489.